**PACIFIC MARITIME ASSOCIATION,**
**Plaintiff,**

**v.**

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION et al., Defendants.**

**No. 51002.**

United States District Court
N. D. California.

March 31, 1969.

Richard Ernst, San Francisco, Cal., for plaintiff.

Norman Leonard of Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., for defendants.

MEMORANDUM OF DECISION

PECKHAM, District Judge.

*The Threshold Issue of Jurisdiction*
*To Enforce the Arbitration*
*Award*

Pacific Maritime Association (PMA), plaintiff, initially * requests this court to confirm and enforce the arbitration award dated March 19, 1969, whereby the Coast Arbitrator ordered the longshoremen and clerks of the International Longshoremen and Warehousemen Union (ILWU) to work on container ships and ships hauling vans as directed by the employer and held that the work stoppage command on March 17, 1969, by the longshoremen and clerks on cargo of these types of vessels was a violation of the Pacific Coast Longshore-Clerks' Agreement 1966–71.

Objection requiring some comment has been made by the defendants that this court lacks jurisdiction to confirm the arbitration award in this case. The defendants contend that to confirm the award would, in effect, be tantamount to entering an injunction against a work stoppage in violation of § 4 of the Norris-LaGuardia Act of 1932, 47 Stat. 70, 29 U.S.C. § 104 (1965). The plaintiff submits this court has jurisdiction under § 301 of the subsequently enacted Labor Management Relations Act of 1947 (Taft-Hartley Act), 61 Stat. 156, 29 U.S.C. § 185(a) (1965).

■ Since the enactment of § 301 in 1947, a long series of cases has unfolded which uphold the jurisdiction of federal courts to specifically enforce agreements to arbitrate (Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)) and to confirm awards resulting from such arbitration (United Steelworkers of America v. America Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d

1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). By thus encouraging the process of arbitration, the courts have been carrying out the congressional and national policy which underlied the enactment of § 301.

To date, the United States Supreme Court has never refused to uphold confirmation of an arbitration award directing cessation of a work stoppage on the ground that doing so would conflict with the Norris-LaGuardia Act. Confirmation of such an award, in fact, would seem the logical extension of a specifically enforceable duty to arbitrate. In one case, where a congressional statute imposed a duty to arbitrate under the Railway Labor Act (44 Stat. 577, 45 U.S.C. §§ 151–188 (1954)), the court upheld a mandatory injunction ordering the cessation of a work stoppage. Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). One lower federal court, in a case indistinguishable in any material way from the instant matter, has also held that such an injunction will lie. New Orleans Steamship Assoc. v. General Longshore Workers, I.L.A. Local Union #1418, 389 F.2d 369 (5th Cir. 1968), cert. denied, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).

To support their contention concerning the absence of jurisdiction, the defendants place much reliance on Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962). There, the Supreme Court held that the Norris-LaGuardia Act deprived the court of jurisdiction to issue an injunction against a strike which violated the "no-strike" clause of a collective bargaining agreement. In *Sinclair*, however, there had been no arbitration resulting in an award similar to the one made in the instant case. Therefore, no arbitrator had made those fine and complex judgments with respect to the very labor dispute

---

* The complaint also sets forth claims for damages not presently before the court for decision.

which the Norris-LaGuardia Act was designed to keep from the federal court forum. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581–582, 80 S.Ct. 1347 (1960).

Since no arbitration occurred in the *Sinclair* case, that case holds only that an injunction against a work stoppage is *not* a necessary accommodation between the Norris-LaGuardia Act and the Labor Management Relations Act in order to make the policies underlying the latter effective. The case does not stand for the proposition that where an orderly method of handling disputes through arbitration has been agreed to and followed by the parties, the court is powerless to confirm that award because of the Norris-LaGuardia Act. See International Longshoremen's Assoc., Local 1291 v. Philadelphia Marine Trade Association, 389 U.S. 64, 77, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967) (Douglas, J., concurring and dissenting opinion).

Any expansive reading of the *Sinclair* decision would seem inconsistent with the declared Congressional policies underlying the two acts. In 1932 Congress declared in enacting the Norris-LaGuardia Act that

> under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the *individual unorganized worker* is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor * * *. 47 Stat. 70, 29 U.S.C. § 102 (emphasis added).

Congress' focus here was upon the individual's helplessness against the concerted economic power of the employer. In order to aid individual workers to organize, Congress outlawed the "yellow-dog contract" and foreclosed the individual from contracting away rights important to the end of organization.

By the time the Labor Management Relations Act was passed in 1947, the labor union was no longer a fledgling institution, and, accordingly, Congress declared that

> \* \* \* \* \* \*
>
> (b) Industrial strife * * * can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety or interest.
>
> It is the purpose and policy of this chapter * * * to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other * * * and to protect the rights of the public in connection with labor disputes affecting commerce. 61 Stat. 136, 29 U.S.C. § 141.

This language indicates Congress' awareness of the transformed position of labor unions during the period from 1932 to 1947 and of their emergence as a powerful, independent force. The language, plus passage of § 301, further indicates that the reasons which underlied the passage of the Norris-LaGuardia Act had lost some of their potency.

Furthermore, several Supreme Court justices have noted the possibility of a collision between the *Sinclair* case and cases similar to the instant one before this court. In so recognizing the possible conflict, three justices have expressly stated that the application of *Sinclair* to this situation is not settled. Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126, 130 (1968) (Stewart, Harlan, and Brennan, JJ., separate opinion). Another justice was even moved to suggest distinctions between *Sinclair* and this type of case. International Longshoremen's Assoc. v. Philadelphia Marine Trade Association, 389 U.S. 64, 77, 88 S.Ct. 201 (1967) (Douglas, J., concurring and dissenting opinion).

In light of this statutory and judicial history, in light of the public interest involved, and in light of a policy favoring arbitration to foster labor-management relations, it would be a strange conclusion that parties who agree to arbitration would still be free to disrupt the labor-management relationship and orderly flow of commerce by a work stoppage in disregard of the arbitrator's award. "No such result should be imputed to Congress; the Supreme Court did not go so far in *Sinclair.*" New Orleans Steamship Assoc. v. General Longshore Workers, I.L.A. Local Union #1418, 389 F.2d 369, 372 (5th Cir. 1968), cert. denied, 393 U.S. 828, 89 S.Ct. 92 (1968). See also Aaron, "The Labor Injunction Reappraised," 10 U.C.L.A.L. Rev. 292, 342–45 (1963).

■ This court, accordingly, holds that where arbitration—as contemplated by § 301 of the Labor Management Relations Act—occurs, an accommodation between that act and the Norris-La-Guardia Act is necessary, and thus this court has jurisdiction to confirm and enforce the arbitrator's award in this case.

Taking guidance from the Supreme Court's decision in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912 (1957), this court fashions its procedure for the confirmation and enforcement of an arbitration award by borrowing, in part, from the federal and state arbitration acts (9 U.S.C. § 9, Cal.Code Civ.Proc. § 1285). The court issued an order to show cause as to why the award should not be confirmed and permanently enforced, provided for immediate service, and set March 27, 1969, for the hearing. Defendants filed and served a written response to the show cause order and a motion to dismiss or, in the alternative, for summary judgment, and set the hearing on the motion for the same time. The court received oral and written evidence and heard oral argument on March 27 and 28, 1969. Having taken these matters under submission at the conclusion of the hearing, the court denies the motion to dismiss or in the alternative

for summary judgment and confirms the arbitration award and, in accordance with Fed.Rules Civ.Proc. 52, now sets out its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Pacific Maritime Association (PMA) is a duly organized and existing California nonprofit corporation having its principal place of business in San Francisco, California, and other places of business in Wilmington, California, Portland, Oregon, and Seattle, Washington. PMA represents its member steamship, stevedoring and terminal companies for the purpose of negotiating and administering the collective bargaining contracts with the unions representing the stevedore employees, including inter alia various classifications of longshoremen and various classifications of clerks, of its member companies. The companies represented by PMA are engaged in commerce, as defined by the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 142.

2. The International Longshoremen's and Warehousemen's Union (ILWU) is a duly organized and existing labor organization within the meaning of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152(5). The ILWU was certified by the National Labor Relations Board on June 21, 1938, as the exclusive bargaining representative for longshoremen on the Pacific Coast. At this time it is the exclusive representative for collective bargaining purposes for employees performing longshore and ship clerk work for members of PMA along the Pacific Coast.

3. ILWU Negotiating Committee, appointed by the ILWU Caucus of October, 1968, is a duly organized and existing labor organization within the meaning of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152(5).

4. Defendants Harry Bridges, J. R. Robertson, Louis Goldblatt, William Ward, William Forrester, Chick Loveridge, Michael Johnson, Carl Smith, G. John Parks, George Ginnis, Oliver Olson,

Curt Johnson, Cleophus Williams, Wes Johnson, Chris Mallos, James Herman, Terrance Sweeney, James A. Jackson, Albert Perisho, James Byrne, Duane Peterson, Joseph Jakovac, and Guy F. Williams are members of ILWU Negotiating Committee.

5. Defendant ILWU Local 7 is a longshore local in Bellingham, Washington. Defendant ILWU Local 8 is a longshore local in Portland, Oregon. Defendant ILWU Local 12 is a longshore local in Coos Bay, Oregon. Defendant ILWU Local 13 is a longshore local in Los Angeles, California. ILWU Local 10 is a longshore local in San Francisco, California. ILWU Local 19 is a longshore local in Seattle, Washington. ILWU Local 23 is a longshore local in Tacoma, Washington. Earl Thomas is president of ILWU Local 7. Charles Elliott is secretary of Local 7, being the successor of defendant Edward Queener. James Kearney is president of Local 10. Odell Franklin is secretary of Local 20. John Godfrey is secretary of Local 13.

6. Defendant ILWU Local 34 is the clerks local in the San Francisco and Northern California area. Defendant ILWU Local 40 is the clerks local in Portland, Oregon, and the Columbia River area. ILWU Local 63 is the clerks local in the Los Angeles-Long Beach and Southern California area.

7. The defendants named in paragraphs 4, 5, and 6 above participated in a meeting on October 21, 1968, in the City and County of San Francisco, California, and at 24 meetings between that date and March 6, 1969, for the purpose of representing or acting for longshore or clerk employees of members of PMA represented for collective bargaining purposes by ILWU, the ILWU Negotiating Committee, and the said ILWU locals.

8. PMA on behalf of its members and the ILWU on behalf of itself, its locals and all employees of PMA members performing longshore or clerks' work have entered into the Pacific Coast Longshore and Clerks' Agreement 1966–1971. This agreement governs wages, hours, working conditions, and discipline of all longshoremen and clerks employed by PMA members on the Pacific Coast. That contract is presently in effect and by its own terms remains in effect until July 1, 1971. This collective bargaining contract was negotiated by ILWU on behalf of itself and all of its longshore and clerks' locals in California, Oregon, and Washington, and all employees performing work under the scope, terms and conditions of this collective bargaining contract, including inter alia, all of the defendants named in the preceding paragraphs hereof.

9. The collective bargaining contract includes a number of provisions with respect to work stoppages, including the following:

"11.1 There shall be no strike, lockout or work stoppage for the life of this Agreement."

"11.2 The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement."

"15.1. There shall be no interference by the Union with the Employer's right to operate efficiently and to change methods of work and to utilize laborsaving devices * * * "

"18.1 As an explicit condition hereof, the parties are committed to observe this Agreement in good faith. The Union commits the locals and every longshoreman [clerk] it represents to observe this commitment without resort to gimmicks or subterfuge. The Employers give the same guarantee of good faith observance on their part."

10. The contract contains a grievance procedure for the investigation and adjudication of all grievances and disputes. It includes a Joint Coast Labor Relations Committee, having jurisdiction over the entire geographical area covered by the collective bargaining contract. It includes provisions for arbitration before a Coast Arbitrator. The ILWU and PMA have duly appointed Sam Kagel to act as Coast Arbitrator un-

der the Pacific Coast Longshore and Clerks Agreement, the said collective bargaining contract. This arbitrator has served as the permanent Coast Arbitrator for over 15 years.

11. The grievance-arbitration procedure of the collective bargaining contract provides, inter alia, as follows:

"17.15 The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted."

The grievance procedure exists "to investigate and adjuducate all grievances and disputes" (17.124). In regard to the handling of health and safety and onerous disputes, as to which the contract states, "it is to be carefully noted that the contract machinery is the same in all disputes * * *", the contract provides that "the Area Arbitrator shall be called to the job for an immediate ruling as to how work shall proceed" if there is not a mutual agreement at an "immediate Joint Port Labor Relations Committee meeting * * * on the job," as to how work shall proceed.

12. With respect to the Joint Coast Labor Relations Committee, which stands above a hierarchy of Port and Area committees, the contract provides:

"The Joint Coast Labor Relations Committee shall function in the administration of this Agreement as provided herein and shall investigate and adjudicate grievances as herein provided." (17.14)

"Any disputes concerning the interpretation or application of provisions of this Contract Document relating to the subject matter of this Section 15 may be submitted directly to the Joint Coast Labor Relations Committee." (15.5)

The grievance-arbitration procedure further provides:

"17.27 In the event that the Employer and Union members of the Joint Coast Labor Relations Committee fail to agree on any question before it, including a question as to whether the issue was properly before the Joint Coast Labor Relations Committee, such question shall be immediately referred at the request of either party to the Coast Arbitrator for hearing and decision, and the decision of the Coast Arbitrator shall be final and conclusive."

13. With regard to the "final and conclusive" decision of the Coast Arbitrator there is further relevant language:

"17.52 Powers of arbitrators shall be limited strictly to the application and interpretation of the Agreement as written. The arbitrator shall have jurisdiction to decide any and all disputes arising under the Agreement including cases dealing with the resumption or continuation of work."

The contract further provides (17.53):

"The arbitrators shall have power to pass upon any and all objections to their jurisdiction."

It further provides:

"17.55 All decisions of the arbitrators * * * shall be final and binding upon all parties. Decisions shall be in writing signed by the arbitrator and delivered to the respective parties."

14. A caucus of longshore, clerks and walking boss locals of the ILWU was held in the City & County of San Francisco, California beginning October 21, 1968. At this caucus, demands were formulated for modifications of the collective bargaining contract in its terms covering among other things, any option as to container freight stations. At this caucus the ILWU authorized a work stoppage program that would inter alia "shut down work on container ships

and ships hauling vans" if its demands were not met. The ILWU further decided, "The time and circumstances in ordering the above work stoppage program to take effect is to be determined by the Negotiating Committee established and authorized to do so by the Caucus."

15. Beginning on November 20, 1968, and continuing through March 6, 1969, defendants and plaintiff held a series of 24 meetings. These discussions and negotiations were carried on with the mutual understanding that said collective bargaining agreement remained in effect until July 1, 1971, and that all persons bound by it remained bound by it until its termination.

16. At the beginning of these meetings, PMA asserted:

PMA is meeting with you (ILWU) today at your request. We are not opening the Contract for negotiating changes in the Contract. We are prepared to listen to what you have to say. * * *"

"To be more specific, the Pacific Coast Longshore Contract Document of 1966–1971 and the pension agreement are contracts that are closed for this duration. This means that we are not required to bargain at this time on any proposals for changes in these contract documents. * * *"

" * * * No discussion regarding these subjects is to be taken as waiving our rights under these contracts. This is true if we listen to or discuss any proposal you make for taking joint action to modify the agreement or form some new agreement."

"To repeat, we are not opening the contract." Throughout the negotiations, the ILWU agreed that the collective bargaining contract remained in effect, which position was explicitly repeated by ILWU at the final meeting on March 6, 1969.

17. At no time was there a mutual agreement to open up the contract so as to free the ILWU and those it represents of their contract obligations—including the obligations set forth under the contract terms quoted hereinabove— prior to July 1, 1971.

18. On January 24, 1969, the ILWU wrote to the PMA as follows:

"As per the PMA's request at our meeting January 23, 1969, we herein resubmit our demands dated November 26, 1968, on the major cost items for a proposed off-dock container freight station agreement. * * *"

" * * * [T]he Union insists that PMA secure the authority from its member companies to negotiate not only on the proposed off-dock container freight station agreement, but also on the Union's demand for pension parity as submitted to PMA on November 20, 1968."

Thereafter ILWU was advised that PMA membership authorized the PMA to bargain for it in the new area of container freight stations of the dock and to discuss, hopefully to a mutually satisfactory solution, the "pension parity" demand.

19. Under date of February 25, 1969, the ILWU wrote to the PMA regarding points that had been under discussion:

"Failing to reach satisfactory agreement on any or all of the above points, the Union reserves the right to take appropriate action on any and all ships operated by member companies of PMA, except that no action will be taken against ships carrying war cargoes."

20. On March 6, 1969, in San Francisco, the PMA was orally advised in the meeting between the PMA and the ILWU that there was no further need to continue these negotiations and that, as the ILWU had not reached a satisfactory agreement on the points referred to in the letter from which the above quotation was taken, the position set forth therein as quoted above was the ILWU's position.

21. The ILWU ordered that work stoppage action that would "shut down work on container ships and ships hauling vans" would be put into effect and that the time when it would begin would be 8 a. m., Monday, March 17, 1969.

22. On Monday, March 17, 1969, the defendants started this work stoppage. As a result, the grievance procedure referred to in paragraphs 11 through 14 above was utilized.

23. PMA prepared a grievance under the grievance-arbitration procedure referred to above, raising charges of contract violation by the work-stoppage program alleged above. This grievance was presented to the Joint Coast Labor Relations Committee on March 18, 1969. That Committee was unable to reach agreement on the questions presented by the grievance. Minutes of this meeting were prepared and duly signed by representatives of PMA and ILWU on the Committee.

24. The existence of the collective bargaining contract does not preclude bargaining to reach a mutually acceptable agreement—ratified by both parties —to amend the collective bargaining contract for the balance of its term, provided that the parties to the contract perform their obligations under it while the bargaining is carried on.

25. In accordance with the contract's grievance-arbitration procedure, the issues involving the work stoppage were presented to Coast Arbitrator Sam Kagel during the afternoon of March 18, 1969. This action was taken pursuant to the power given by the contract to either party to immediately refer any questions on which there is a failure to agree by the Joint Coast Labor Relations Committee "to the arbitrator for hearing and decision". The ILWU—having received due and proper notice of the hearing, having made no objection to the time or place of the hearing, having been invited to attend the hearing, and having determined that it would not attend the meeting—permitted the proceedings before the Arbitrator to proceed without its being present. The signed minutes of the Joint Coast Labor Relations Committee meeting of March 18, 1969, are included in the record of the arbitration proceeding.

26. On March 19, 1969, Coast Arbitrator Sam Kagel rendered his award and decision. A copy of that decision is appended hereto and is incorporated herein by reference.

27. Since March 19, 1969, defendants and each of them have refused to comply with the arbitrator's award.

28. During the past 20 years, on more than 100 occasions, arbitration awards handed down under the procedures of the ILWU–PMA collective bargaining contract have directed longshoremen or clerks, or both groups, to work as directed by the employer on the specific work that was the subject matter of the grievance presented to the arbitrator. There has developed, as normal and standard practice, under the collective bargaining agreement, that the employers, the ILWU, its locals, and the longshoremen or clerks, or both, have complied with such arbitration awards upon their issuance.

29. A complaint charging violation of the collective bargaining contract and the arbitrator's award and praying for confirmation and enforcement of the award was duly filed on March 20, 1969. During a hearing in open court in this case with regard to an application for temporary relief pendente lite, agreement was reached between counsel for plaintiff and counsel for defendants that should this Court enter an order to show cause at a hearing on the merits of the request for confirmation and enforcement of the award, it could be set for 10 a. m., March 27, 1969. On March 25, 1969, such an order to show cause was entered by this Court. Proof of service on ILWU and on defendants named above has been filed.

30. PMA and its members have fully exhausted the procedures of the collective bargaining contract to resolve the disputes involved in the arbitration award through the arbitration provisions of the collective bargaining agreement. ILWU has carried on the work stoppage program during the period of the term of the ILWU–PMA collective bargaining

contract, and continues to carry on the work stoppage program.

31. The continuance of the work stoppage is causing substantial and irreparable injury to the general public of Alaska (over 50% of the goods shipped to Alaska are containerized) and Hawaii (over 75% of the goods shipped to Hawaii are containerized), to shippers and consignees whose cargoes are not being received or used, to PMA members, some of whom have already incurred losses in excess of $1,000,000 and are incurring further losses to their reputation for providing dependable water transportation by container.

32. PMA and its members have no adequate remedy at law.

33. With regard to the enforcement of the arbitration award, greater injury will be inflicted upon plaintiff by the denial of relief than will be inflicted upon defendants by the granting of relief.

The following conclusions of law, insofar as they may be concluded by findings of fact, are so found by this Court to be true in all respects. From the foregoing facts, the Court concludes that :

## CONCLUSIONS OF LAW

### I.

The original jurisdiction of this Court has been properly invoked pursuant to Sec. 301(a) of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. Sec. 185(a).

### II.

The award of the Coast Arbitrator, Sam Kagel, dated March 19, 1969, was rendered in complete accordance with the terms of the collective bargaining contract between PMA and ILWU, particularly the terms governing the grievance-arbitration procedure.

(a) This contract provides for arbitration as the terminal point of any disagreement, or any failure to agree, on any question presented to the arbitrator through the grievance procedure.

(b) As stated in their contract, the parties to this contract intended that the grievance procedure, leading to final and binding awards of the arbitrator, would be the exclusive method of resolving disputes arising under this contract.

(c) As to disputes in the grievance procedure, it was the arbitrator's judgment that was bargained for by the parties to this collective bargaining contract.

(d) The contract lawfully gives the arbitrator the power to pass upon any and all questions as to his jurisdiction.

(e) The contract gives the arbitrator the jurisdiction to hear the disputes presented in the minutes of the Coast Labor Relations Committee meeting of March 18, 1969, and to hear these disputes and to interpret and apply the contract in adjudicating the disputes dealing with the resumption or continuation of the work.

(f) The arbitrator has premised his award on the contract terms, including these that there shall be no interference by the ILWU with the employers' right to utilize laborsaving devices (such as containers and vans) during the life of the contract which continues until July 1, 1971, that there shall be no strike, lockout or work stoppage for the life of the contract, that the ILWU shall be required to secure observance of the contract by its longshore and clerks locals and by the employees working under the collective bargaining contract, and that the ILWU, the longshore and clerk locals and every longshoreman and every clerk represented by the ILWU are by explicit condition of the contract committed to observe the contract in good faith without resort to gimmick or subterfuge.

### III.

The arbitrator determined that he had jurisdiction under the contract to hear the disputes raised and to interpret and apply the contract in adjudicating the disputes including the power to issue the award he did. This award is final and binding, "just as the contract says it is."

Humphrey v. Moore, 375 U.S. 335, 351, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964) relying upon General Drivers, etc., Union No. 89 v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963).

## IV.

The award of Arbitrator Sam Kagel dated March 19, 1969, under the ILWU–PMA collective bargaining contract must be confirmed and enforced.

## APPENDIX

| | |
|---|---|
| In the Matter of a Controversy<br><br>between<br><br>PACIFIC MARITIME ASSOCIATION,<br>Complainant,<br><br>and<br><br>INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION,<br>Respondent.<br><br>Involving the work-stoppage program of the Union with reference to containers and vans. | ORDER AND DECISION<br><br>SAM KAGEL<br>COAST ARBITRATOR<br>San Francisco, California<br>March 19, 1969 |

BACKGROUND:

A Coast arbitration hearing was held the afternoon of March 18, 1969. Representatives of the Pacific Maritime Association were present at the hearing. Representatives of the International Longshoremen's and Warehouseman's Union were not present.

A meeting of the Coast Labor Relations Committee was held the morning of March 18, 1969. The PMA and ILWU representatives were present at the meeting. The complaints of PMA which will be considered hereinafter were discussed at that meeting. Based on its complaints, PMA made seven motions, all of which were deadlocked. PMA then asked that these deadlocked motions be presented to the Coast Arbitrator for decisions.

Prior to the arbitration hearing, both PMA and ILWU signed and agreed to the minutes of the morning meeting held March 18, 1969. These minutes are Joint Exhibit 4. The minutes read that the Union "had no objection to the Employers taking the matter to the Coast Arbitrator on an ex-parte basis". The Union further stated that " * * * it might be there (the arbitration hearing set for 2:30 p. m. on March 18, 1969, at PMA office), but was not sure of this". As already noted, Union representatives did not appear at the arbitration hearing.

This arbitration, therefore, proceeded on an ex-parte basis. In addition to the Union's agreement that the arbitration could proceed on an ex-parte basis, the basic Agreements between the parties provide for such a procedure (Jt. Exs. 1 and 2).

Thus, Section 17.27 of the Longshore and Clerks agreements reads:

"In the event that the Employer and Union members of the Joint Coast Labor Relations Committee fail to agree on any question before it, including a question as to whether the issue was properly before the Coast Labor Relations Committee, such question shall be immediately referred at the request of either party to the Coast Arbitrator for hearing and decision, and the decision of the Coast Arbitrator shall be final and conclusive."

And Section 17.281 of the Longshore and Clerks agreements reads:

"Should either party fail to participate in any steps of the grievance

machinery, the matter shall automatically move to the next higher level.

Section 15.5 of the Longshore and Section 15.4 of the Clerks agreement reads:

"Any dispute concerning the interpretation or application of provisions of this Contract Document relating to the subject matter of this Section 15 may be submitted directly to the Joint Coast Labor Relations Committee."

Therefore, it is held that the ex-parte arbitration held March 18, 1969, before the Coast Arbitrator was authorized by the Union and the Employers and by the specific terms of the applicable agreements.

Section 17.27 of both the Longshore agreement and the Clerks agreement provides that "the decision of the Coast Arbitrator shall be final and conclusive".

## THE DEADLOCKED ISSUES:

The agreed-upon March 18, 1969, minutes of the Coast Labor Relations Committee (Jt. Ex. 4) stated that commencing on Monday, March 17, at 8 a. m., several vessels had been affected by work stoppages and the Employers claimed that these work stoppages were part of a work-stoppage program on the Coast and such work stoppages were a violation of specific provisions of the Agreements. Attached to the minutes as Exhibit C was a list of the vessels which the Employers claimed were affected by work stoppages.

The Sections of the Agreement which the Employers claimed were violated included Sections 11.1, 11.2, 15.2, and 18.

The Employers then made the following motions which requested that certain actions be taken and which were deadlocked:

"The Employers then moved that the International Union and its locals representing employees of PMA companies, the committees and other subordinate entities of the International and these ILWU locals, the members of these committees and entities and the employees of PMA companies represented by the ILWU and all others acting in concert with them—take the following actions:

"1. Set aside the action of the ILWU Longshore Clerk and Walking Boss Caucus that convened on October 21, 1968, to the full extent that such action called for, suggested, encouraged, directed, caused, or 'authorized' any work-stoppage action prior to the termination date of the contract on July 1, 1971, and to cease and desist from any action to cause, call for, suggest, encourage, direct, or 'authorize' any other strike or work-stoppage action prior to the said contract termination date.

"2. Rescind the action calling the work stoppage and all actions taken toward placing the work-stoppage program in effect or calling for any participation in or support of such work-stoppage action by any employes of PMA companies represented by the ILWU.

"3. Stop the present work stoppage that has 'shut down work on container ships and ships hauling vans'.

"4. Advise all officials of the International and the locals involved and all employes of PMA member companies represented by the ILWU that any action of carrying on this work-stoppage program is in violation of the collective bargaining contract and that the ILWU is required to secure observance of the provision in the agreement that there shall be no such work stoppage.

"5. Order and direct the officials and other individuals participating in the actions of the International, these ILWU locals, the Negotiating Committee, and any other committees or subordinate entities of the ILWU or these ILWU locals:

a. that such work stoppage shall not take place or continue and

b. that they and each of them shall do whatever may be necessary to stop immediately the work stoppage that is in effect.

"6. Advise each of the employees of PMA companies represented by the ILWU that the Union is complying with its obligation to secure observance of the agreement provision that the work stoppage that began at 8 a. m., March 17, 1969, shall not continue and that men and gangs shall perform work on all ships, including container ships and ships hauling vans in accordance with the procedures and practices in regard thereto that have been in effect under the mechanization agreement terms.

"7. Do all actions otherwise necessary (a) to prevent the institution or continuance of any type of work-stoppage action in violation of the contract, including any type purportedly 'authorized' by the 1968 caucus and (b) to cause all work of longshoremen, including work on container ships and ships hauling vans, to be carried on in accordance with the procedures that have been followed during the period of the mechanization agreement until the termination of the collective bargaining contract on July 1, 1971."

## SUMMARY:

The evidence presented and which is in the record of this case establishes that work stoppages as alleged by the Employers took place and may continue to take place.

Section 11.1 of both the Longshore and Clerks agreements reads:

'There shall be no strike, lockout or work stoppage for the life of this Agreement."

Section 15.1 of the Longshore and Clerks agreements reads:

"There shall be no interference by the Union with the Employers' right to operate efficiently and to change methods of work and to utilize labor-saving devices and to direct the work through employer representatives while explicitly observing the provisions and conditions of this Contract Document protecting the safety and welfare of the employees and avoiding speedup.

'Speedup' refers to an onerous workload on the individual worker; it shall not be construed to refer to increased production resulting from more efficient utilization and organization of the workforce, introduction of labor-saving devices, or removal of work restrictions."

Section 11.2 of both agreements reads:

"The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement."

Section 18.1 of both agreements is entitled "Good Faith Guarantee" and reads:

"As an explicit condition hereof, the parties are committed to observe this Agreement in good faith. The Union commits the locals and every longshoreman it represents to observe this commitment without resort to gimmicks or subterfuge. The Employers give the same guarantee of good faith observance on their part."

The evidence sustains the violations of the agreements claimed by the Employers and the agreements themselves clearly establish that the relief sought by the Employers is proper and in fact provided for by the agreements themselves.

## DECISION:

The International Longshoremen's and Warehousemen's Union and its local unions representing employees of Pacific Maritime Association companies, the committees and other subordinate entities of the International Union and its local unions, the members of these committees and entities, and the employees of PMA companies represented by the ILWU and all others acting in concert with them shall take the following actions forthwith:

1. Set aside the action of the ILWU Longshore, Clerk and Walking Boss Caucus that convened on October 21, 1968, to the full extent that such action called for, suggested, encouraged, directed, caused, or "authorized" any work-stoppage action prior to the termination date of the contract on

July 1, 1971, and to cease and desist from any action to cause, call for, suggest, encourage, direct, or "authorize" any other strike or work-stoppage action prior to the said contract termination date.

2. Rescind the action calling the work stoppage and all other actions taken toward placing the work-stoppage program in effect or calling for any participation in or support of such work-stoppage action by any employees of PMA companies represented by the ILWU.

3. Stop the present work stoppage that has "shut down work on container ships and ships hauling vans."

4. Advise all officials of the International and the locals involved and all employees of PMA member companies represented by the ILWU that any action of carrying on this work-stoppage program is in violation of the collective bargaining contract and that the ILWU is required to secure observance of the provision in the agreement that there shall be no such work stoppage.

5. Order and direct the officials and other individuals participating in the actions of the International, these ILWU locals, the Negotiating Committee, and any other committees or subordinate entities of the ILWU or these ILWU locals:

    a. that such work stoppage shall not take place or continue and

    b. that they and each of them shall do whatever may be necessary to stop immediately the work stoppage that is in effect.

6. Advise each of the employees of PMA companies represented by the ILWU that the Union is complying with its obligation to secure observance of the agreement provision that the work stoppage that began at 8 a. m., March 17, 1969, shall not continue and that men and gangs shall perform work on all ships, including container ships and ships hauling vans, in accordance with the procedures and practices in regard thereto that have been in effect under the mechanization agreement terms.

7. Do all actions otherwise necessary (a) to prevent the institution or continuance of any type of work-stoppage action in violation of the contract, including any type purportedly "authorized" by the 1968 caucus, and (b) to cause all work of longshoremen, including work on container ships and ships hauling vans, to be carried on in accordance with the procedures that have been followed during the period of the mechanization agreement until the termination of the collective bargaining contract on July 1, 1971.

In pursuance of the foregoing, the longshoremen and clerks are ordered to work on container ships and ships hauling vans as directed by the Employer.

            (s) Sam Kakel
            Coast Arbitrator