## BOYS MARKETS, INC. *v.* RETAIL CLERKS UNION, LOCAL 770

No. 768.   Argued April 21–22, 1970—Decided June 1, 1970

236

*Joseph M. McLaughlin* argued the cause and filed briefs for petitioner.

*Kenneth M. Schwartz* argued the cause for respondent. With him on the brief were *Laurence D. Steinsapir* and *Robert M. Dohrmann*.

Briefs of *amici curiae* were filed by *William H. Willcox* and *Lawrence M. Cohen* for the Chamber of Commerce of the United States; by *George R. Fearon* for Associated Industries of New York State, Inc.; by *John E. Branch* and *James Pulm Swann, Jr.*, for General Electric Co.; by *Carl M. Gould* and *Stanley E. Tobin* for the Plumbing-Heating & Piping Employers Council of Southern California, Inc.; by *Harold I. Elbert* for Peabody Coal Co.; and by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In this case we re-examine the holding of *Sinclair Refining Co.* v. *Atkinson*, 370 U. S. 195 (1962), that the anti-injunction provisions of the Norris-LaGuardia Act[1] preclude a federal district court from enjoining a strike in breach of a no-strike obligation under a collective-

---

[1] "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

. . . . .

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

. . . . .

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified . . . ." § 4, 47 Stat. 70, 29 U. S. C. § 104.

bargaining agreement, even though that agreement contains provisions, enforceable under § 301 (a) of the Labor Management Relations Act, 1947,[2] for binding arbitration of the grievance dispute concerning which the strike was called. The Court of Appeals for the Ninth Circuit, considering itself bound by *Sinclair,* reversed the grant by the District Court for the Central District of California of petitioner's prayer for injunctive relief. 416 F. 2d 368 (1969). We granted certiorari. 396 U. S. 1000 (1970). Having concluded that *Sinclair* was erroneously decided and that subsequent events have undermined its continuing validity, we overrule that decision and reverse the judgment of the Court of Appeals.

## I

In February 1969, at the time of the incidents that produced this litigation, petitioner and respondent were parties to a collective-bargaining agreement which provided, *inter alia,* that all controversies concerning its interpretation or application should be resolved by adjustment and arbitration procedures set forth therein[3] and that, during the life of the contract, there should

---

[2] "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 61 Stat. 156, 29 U. S. C. § 185 (a).

[3]                        "ARTICLE XIV
               "ADJUSTMENT AND ARBITRATION
"A. CONTROVERSY, DISPUTE OR DISAGREEMENT.
"Any and all matters of controversy, dispute or disagreement of any kind or character existing between the parties and arising out of or in any way involving the interpretation or application of the terms of this Agreement . . . [with certain exceptions not relevant

be "no cessation or stoppage of work, lock-out, picketing or boycotts . . . ." [4]   The dispute arose when petitioner's frozen foods supervisor and certain members of his crew who were not members of the bargaining unit began to rearrange merchandise in the frozen food cases of one of petitioner's supermarkets.   A union representative insisted that the food cases be stripped of all merchandise and be restocked by union personnel.   When petitioner did not accede to the union's demand, a strike was called and the union began to picket petitioner's establishment. Thereupon petitioner demanded that the union cease the work stoppage and picketing and sought to invoke the grievance and arbitration procedures specified in the contract.

The following day, since the strike had not been terminated, petitioner filed a complaint in California

---

to the instant case] shall be settled and resolved by the procedures and in the manner hereinafter set forth.

"B. ADJUSTMENT PROCEDURE.

.          .          .          .          .

"C. ARBITRATION.

"1. Any matter not satisfactorily settled or resolved in Paragraph B hereinabove shall be submitted to arbitration for final determination upon written demand of either party. . . .

.          .          .          .          .

"4. The arbitrator or board of arbitration shall be empowered to hear and determine the matter in question and the determination shall be final and binding upon the parties, subject only to their rights under law. . . ."

[4] "D. POWERS, LIMITATIONS AND RESERVATIONS.

.          .          .          .

"2. *Work Stoppages.*   Matters subject to the procedures of this Article shall be settled and resolved in the manner provided herein. During the term of this Agreement, there shall be no cessation or stoppage of work, lock-out, picketing or boycotts, except that this limitation shall not be binding upon either party hereto if the other party refuses to perform any obligation under this Article or refuses or fails to abide by, accept or perform a decision or award of an arbitrator or board."

Superior Court seeking a temporary restraining order, a preliminary and permanent injunction, and specific performance of the contractual arbitration provision. The state court issued a temporary restraining order forbidding continuation of the strike and also an order to show cause why a preliminary injunction should not be granted. Shortly thereafter, the union removed the case to the Federal District Court and there made a motion to quash the state court's temporary restraining order. In opposition, petitioner moved for an order compelling arbitration and enjoining continuation of the strike. Concluding that the dispute was subject to arbitration under the collective-bargaining agreement and that the strike was in violation of the contract, the District Court ordered the parties to arbitrate the underlying dispute and simultaneously enjoined the strike, all picketing in the vicinity of petitioner's supermarket, and any attempts by the union to induce the employees to strike or to refuse to perform their services.

## II

At the outset, we are met with respondent's contention that *Sinclair* ought not to be disturbed because the decision turned on a question of statutory construction which Congress can alter at any time. Since Congress has not modified our conclusions in *Sinclair*, even though it has been urged to do so,[5] respondent argues that principles of *stare decisis* should govern the present case.

We do not agree that the doctrine of *stare decisis* bars a re-examination of *Sinclair* in the circumstances of this case. We fully recognize that important policy considerations militate in favor of continuity and predictability in the law. Nevertheless, as Mr. Justice Frankfurter

---

[5] See, *e. g.,* Report of Special *Atkinson-Sinclair* Committee, A. B. A. Labor Relations Law Section—Proceedings 226 (1963) [hereinafter cited as A. B. A. *Sinclair* Report].

wrote for the Court, "[S]*tare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940). See *Swift & Co.* v. *Wickham,* 382 U. S. 111, 116 (1965). It is precisely because *Sinclair* stands as a significant departure from our otherwise consistent emphasis upon the congressional policy to promote the peaceful settlement of labor disputes through arbitration [6] and our efforts to accommodate and harmonize this policy with those underlying the anti-injunction provisions of the Norris-LaGuardia Act [7] that we believe *Sinclair* should be reconsidered. Furthermore, in light of developments subsequent to *Sinclair,* in particular our decision in *Avco Corp.* v. *Aero Lodge 735,* 390 U. S. 557 (1968), it has become clear that the *Sinclair* decision does not further but rather frustrates realization of an important goal of our national labor policy.

Nor can we agree that conclusive weight should be accorded to the failure of Congress to respond to *Sinclair* on the theory that congressional silence should be interpreted as acceptance of the decision. The Court has cautioned that "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard* v. *United States,* 328 U. S. 61, 69

---

[6] See, *e. g., United Steelworkers of America* v. *American Mfg. Co.,* 363 U. S. 564 (1960); *United Steelworkers of America* v. *Warrior & Gulf Nav. Co.,* 363 U. S. 574 (1960); *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593 (1960); *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448 (1957).

[7] See, *e. g., Brotherhood of Railroad Trainmen* v. *Chicago River & Ind. R. Co.,* 353 U. S. 30 (1957); *Textile Workers Union* v. *Lincoln Mills, supra;* cf. *Graham* v. *Brotherhood of Firemen,* 338 U. S. 232 (1949). See also *United States* v. *Hutcheson,* 312 U. S. 219 (1941).

(1946). Therefore, in the absence of any persuasive circumstances evidencing a clear design that congressional inaction be taken as acceptance of *Sinclair,* the mere silence of Congress is not a sufficient reason for refusing to reconsider the decision. *Helvering* v. *Hallock, supra,* at 119–120.

### III

From the time *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448 (1957), was decided, we have frequently found it necessary to consider various substantive and procedural aspects of federal labor contract law and questions concerning its application in both state and federal courts. *Lincoln Mills* held generally that "the substantive law to apply in suits under § 301 (a) is federal law, which the courts must fashion from the policy of our national labor laws," 353 U. S., at 456, and more specifically that a union can obtain specific performance of an employer's promise to arbitrate grievances. We rejected the contention that the anti-injunction proscriptions of the Norris-LaGuardia Act prohibited this type of relief, noting that a refusal to arbitrate was not "part and parcel of the abuses against which the Act was aimed," *id.,* at 458, and that the Act itself manifests a policy determination that arbitration should be encouraged. See 29 U. S. C. § 108.[8] Subsequently in the *Steelworkers*

---

[8] Section 108 provides:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

See generally *Brotherhood of Railroad Trainmen* v. *Toledo, Peoria & W. R. Co.,* 321 U. S. 50 (1944).

*Trilogy* [9] we emphasized the importance of arbitration as an instrument of federal policy for resolving disputes between labor and management and cautioned the lower courts against usurping the functions of the arbitrator.

Serious questions remained, however, concerning the role that state courts were to play in suits involving collective-bargaining agreements. Confronted with some of these problems in *Charles Dowd Box Co.* v. *Courtney,* 368 U. S. 502 (1962), we held that Congress clearly intended *not* to disturb the pre-existing jurisdiction of the state courts over suits for violations of collective-bargaining agreements. We noted that the

> "clear implication of the entire record of the congressional debates in both 1946 and 1947 is that the purpose of conferring jurisdiction upon the federal district courts was not to displace, but to supplement, the thoroughly considered jurisdiction of the courts of the various States over contracts made by labor organizations." *Id.,* at 511.

Shortly after the decision in *Dowd Box,* we sustained, in *Teamsters Local 174* v. *Lucas Flour Co.,* 369 U. S. 95 (1962), an award of damages by a state court to an employer for a breach by the union of a no-strike provision in its contract. While emphasizing that "in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules," *id.,* at 104, we did not consider the applicability of the Norris-LaGuardia Act to state court proceedings because the employer's prayer for relief sought only

---

[9] *United Steelworkers of America* v. *American Mfg. Co., supra; United Steelworkers of America* v. *Warrior & Gulf Nav. Co., supra; United Steelworkers of America* v. *Enterprise Wheel & Car Corp., supra.*

damages and not specific performance of a no-strike obligation.

Subsequent to the decision in *Sinclair,* we held in *Avco Corp.* v. *Aero Lodge 735, supra,* that § 301 (a) suits initially brought in state courts may be removed to the designated federal forum under the federal question removal jurisdiction delineated in 28 U. S. C. § 1441. In so holding, however, the Court expressly left open the questions whether state courts are bound by the anti-injunction proscriptions of the Norris-LaGuardia Act and whether federal courts, after removal of a § 301 (a) action, are required to dissolve any injunctive relief previously granted by the state courts. See generally *General Electric Co.* v. *Local Union 191,* 413 F. 2d 964 (C. A. 5th Cir. 1969) (dissolution of state injunction required). Three Justices who concurred expressed the view that *Sinclair* should be reconsidered "upon an appropriate future occasion." 390 U. S., at 562 (STEWART, J., concurring).[10]

The decision in *Avco,* viewed in the context of *Lincoln Mills* and its progeny, has produced an anomalous situation which, in our view, makes urgent the reconsideration of *Sinclair.* The principal practical effect of *Avco* and *Sinclair* taken together is nothing less than to oust state courts of jurisdiction in § 301 (a) suits where injunc-

---

[10] Shortly after *Sinclair* was decided, an erosive process began to weaken its underpinnings. Various authorities suggested methods of mitigating the absolute rigor of the *Sinclair* rule. For example, the Court of Appeals for the Fifth Circuit held that *Sinclair* does not prevent a federal district court from enforcing an arbitrator's order directing a union to terminate work stoppages in violation of a no-strike clause. *New Orleans Steamship Assn.* v. *General Longshore Workers,* 389 F. 2d 369, cert. denied, 393 U. S. 828 (1968); see *Pacific Maritime Assn.* v. *International Longshoremen,* 304 F. Supp. 1315 (D. C. N. D. Cal. 1969). See generally Keene, The Supreme Court, Section 301 and No-Strike Clauses: From *Lincoln Mills* to *Avco* and Beyond, 15 Vill. L. Rev. 32 (1969).

tive relief is sought for breach of a no-strike obligation. Union defendants can, as a matter of course, obtain removal to a federal court,[11] and there is obviously a compelling incentive for them to do so in order to gain the advantage of the strictures upon injunctive relief which *Sinclair* imposes on federal courts. The sanctioning of this practice, however, is wholly inconsistent with our conclusion in *Dowd Box* that the congressional purpose embodied in § 301 (a) was to *supplement,* and not to encroach upon, the pre-existing jurisdiction of the state courts.[12] It is ironic indeed that the very provision that Congress clearly intended to provide additional remedies for breach of collective-bargaining agreements has been employed to displace previously existing state remedies. We are not at liberty thus to depart from the clearly expressed congressional policy to the contrary.

On the other hand, to the extent that widely disparate remedies theoretically remain available in state, as opposed to federal, courts, the federal policy of labor law

---

[11] Section 301 (a) suits require neither the existence of diversity of citizenship nor a minimum jurisdictional amount in controversy. All § 301 (a) suits may be removed pursuant to 28 U. S. C. § 1441.

[12] The view that state court jurisdiction would not be disturbed by § 301 (a) was perhaps most clearly articulated by Senator Ferguson, a spokesman for that provision, in a Senate debate in 1946:

"Mr. FERGUSON. Mr. President, there is nothing whatever in the now-being-considered amendment which takes away from the State courts all the present rights of the State courts to adjudicate the rights between parties in relation to labor agreements. The amendment merely says that the Federal courts shall have jurisdiction. It does not attempt to take away the jurisdiction of the State courts, and the mere fact that the Senator and I disagree does not change the effect of the amendment.

"Mr. MURRAY. But it authorizes the employers to bring suit in the Federal courts, if they so desire.

"Mr. FERGUSON. That is correct. That is all it does. It takes away no jurisdiction of the State courts." 92 Cong. Rec. 5708.

uniformity elaborated in *Lucas Flour Co.*, is seriously offended. This policy, of course, could hardly require, as a practical matter, that labor law be administered identically in all courts, for undoubtedly a certain diversity exists among the state and federal systems in matters of procedural and remedial detail, a fact that Congress evidently took into account in deciding not to disturb the traditional jurisdiction of the States. The injunction, however, is so important a remedial device, particularly in the arbitration context, that its availability or non-availability in various courts will not only produce rampant forum shopping and maneuvering from one court to another but will also greatly frustrate any relative uniformity in the enforcement of arbitration agreements.

Furthermore, the existing scheme, with the injunction remedy technically available in the state courts but rendered inefficacious by the removal device, assigns to removal proceedings a totally unintended function. While the underlying purposes of Congress in providing for federal question removal jurisdiction remain somewhat obscure,[13] there has never been a serious contention that Congress intended that the removal mechanism be utilized to foreclose completely remedies otherwise available in the state courts. Although federal question removal jurisdiction may well have been intended to provide a forum for the protection of federal rights where such protection was deemed necessary or to encourage the development of expertise by the federal courts in the

---

[13] The legislative history of the federal question removal provision is meager, but it has been suggested that its purpose was the same as original federal question jurisdiction, enacted at the same time in the Judiciary Act of 1875, 18 Stat. 470, namely, to protect federal rights, see H. Hart & H. Wechsler, The Federal Courts and the Federal System 727–733 (1953), and to provide a forum that could more accurately interpret federal law, see Mishkin, The Federal "Question" in the District Courts, 53 Col. L. Rev. 157, 159 (1953). 113 U. Pa. L. Rev. 1096, 1098 and n. 17 (1965).

interpretation of federal law, there is no indication that Congress intended by the removal mechanism to effect a wholesale dislocation in the allocation of judicial business between the state and federal courts. Cf. *City of Greenwood* v. *Peacock,* 384 U. S. 808 (1966).

It is undoubtedly true that each of the foregoing objections to *Sinclair-Avco* could be remedied either by overruling *Sinclair* or by extending that decision to the States. While some commentators have suggested that the solution to the present unsatisfactory situation does lie in the extension of the *Sinclair* prohibition to state court proceedings,[14] we agree with Chief Justice Traynor of the California Supreme Court that "whether or not Congress could deprive state courts of the power to give such [injunctive] remedies when enforcing collective bargaining agreements, it has not attempted to do so either in the Norris-LaGuardia Act or section 301." *McCarroll* v. *Los Angeles County Dist. Council of Carpenters,* 49 Cal. 2d 45, 63, 315 P. 2d 322, 332 (1957), cert. denied, 355 U. S. 932 (1958). See, *e. g., American Dredging Co.* v. *Marine Local 25,* 338 F. 2d 837 (C. A. 3d Cir. 1964), cert. denied, 380 U. S. 935 (1965); *Shaw Electric Co.* v. *I. B. E. W.,* 418 Pa. 1, 208 A. 2d 769 (1965).

An additional reason for not resolving the existing dilemma by extending *Sinclair* to the States is the devastating implications for the enforceability of arbitration agreements and their accompanying no-strike obligations if equitable remedies were not available.[15] As we have

---

[14] See, *e. g.,* Bartosic, Injunctions and Section 301: The Patchwork of *Avco* and *Philadelphia Marine* on the Fabric of National Labor Policy, 69 Col. L. Rev. 980 (1969); Dunau, Three Problems in Labor Arbitration, 55 Va. L. Rev. 427 (1969).

[15] It is true that about one-half of the States have enacted so-called "little Norris-LaGuardia Acts" that place various restrictions upon the granting of injunctions by state courts in labor disputes. However, because many States do not bar injunctive relief for violations of collective-bargaining agreements, in only about 14 jurisdictions

previously indicated, a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration. See *Textile Workers Union* v. *Lincoln Mills, supra,* at 455.[16] Any incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated. While it is of course true, as respondent contends, that other avenues of redress, such as an action for damages, would remain open to an aggrieved employer, an award of damages after a dispute has been settled is no substitute for an immediate halt to an illegal strike. Furthermore, an action for damages prosecuted during or after a labor dispute would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union.[17]

---

is there a significant Norris-LaGuardia-type prohibition against equitable remedies for breach of no-strike obligations. See Bartosic, *supra,* n. 14, at 1001–1006; Keene, *supra,* n. 10, at 49 and nn. 79, 80.

[16] We held in *Teamsters Local 174* v. *Lucas Flour Co., supra,* that, even in the absence of an express no-strike clause in the collective-bargaining contract, an agreement that certain disputes "will be exclusively covered by compulsory terminal arbitration" (369 U. S., at 106) gives rise to an implied promise by the union not to strike during the term of the contract in response to these arbitrable disputes. *Id.,* at 104–106. In the present case, there was an express no-strike clause in the union-management contract. See n. 4, *supra.*

[17] As the neutral members of the A. B. A. committee on the problems raised by *Sinclair* noted in their report:

"Under existing laws, employers may maintain an action for damages resulting from a strike in breach of contract and may discipline the employees involved. In many cases, however, neither of these alternatives will be feasible. Discharge of the strikers is often inexpedient because of a lack of qualified replacements or because of the adverse effect on relationships within the plant. The damage remedy may also be unsatisfactory because the employer's losses

Even if management is not encouraged by the unavailability of the injunction remedy to resist arbitration agreements, the fact remains that the effectiveness of such agreements would be greatly reduced if injunctive relief were withheld. Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures. This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate. Thus, because *Sinclair*, in the aftermath of *Avco,* casts serious doubt upon the effective enforcement of a vital element of stable labor-management relations—arbitration agreements with their attendant no-strike obligations—we conclude that *Sinclair* does not make a viable contribution to federal labor policy.

## IV

We have also determined that the dissenting opinion in *Sinclair* states the correct principles concerning the accommodation necessary between the seemingly absolute terms of the Norris-LaGuardia Act and the policy considerations underlying § 301 (a).[18]    370 U. S., at 215.

---

are often hard to calculate and because the employer may hesitate to exacerbate relations with the union by bringing a damage action. Hence, injunctive relief will often be the only effective means by which to remedy the breach of the no-strike pledge and thus effectuate federal labor policy." A. B. A. *Sinclair* Report 242.

[18] Scholarly criticism of *Sinclair* has been sharp, and it appears to be almost universally recognized that *Sinclair,* particularly after *Avco,* has produced an untenable situation. The commentators are divided, however, with respect to proposed solutions, some favoring reconsideration of *Sinclair,* others suggesting extension of *Sinclair* to the States, and still others recommending that any action in this area be left to Congress. See generally Aaron, Strikes in Breach of

Although we need not repeat all that was there said, a few points should be emphasized at this time.

The literal terms of § 4 of the Norris-LaGuardia Act must be accommodated to the subsequently enacted provisions of § 301 (a) of the Labor Management Relations Act and the purposes of arbitration. Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions. See *Richards* v. *United States,* 369 U. S. 1, 11 (1962); *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 285 (1956); *United States* v. *Hutcheson,* 312 U. S. 219, 235 (1941).

The Norris-LaGuardia Act was responsive to a situation totally different from that which exists today. In the early part of this century, the federal courts generally were regarded as allies of management in its attempt to prevent the organization and strengthening of labor unions; and in this industrial struggle the injunction became a potent weapon that was wielded against the activities of labor groups.[19] The result was a large number of sweeping decrees, often issued *ex parte,* drawn on an *ad hoc* basis without regard to any systematic elaboration of national labor policy. See *Drivers' Union* v. *Lake Valley Co.,* 311 U. S. 91, 102 (1940).

---

Collective Agreements: Some Unanswered Questions, 63 Col. L. Rev. 1027 (1963); Aaron, The Labor Injunction Reappraised, 10 U. C, L. A. L. Rev. 292 (1963); Bartosic, *supra,* n, 14; Dunau, *supra,* n. 14; Keene, *supra,* n, 10; Kiernan, Availability of Injunctions Against Breaches of No-Strike Agreements in Labor Contracts, 32 Albany L. Rev. 303 (1968); Wellington, The No-Strike Clause and the Labor Injunction: Time for a Re-examination, 30 U. Pitt. L. Rev. 293 (1968); Wellington & Albert, Statutory Interpretation and the Political Process: A Comment on Sinclair v. Atkinson, 72 Yale L. J. 1547 (1963).

[19] See generally F. Frankfurter & N. Greene, The Labor Injunction (1930).

In 1932 Congress attempted to bring some order out of the industrial chaos that had developed and to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of management. See declaration of public policy, Norris-LaGuardia Act, § 2, 47 Stat. 70. Congress, therefore, determined initially to limit severely the power of the federal courts to issue injunctions "in any case involving or growing out of any labor dispute . . . ." § 4, 47 Stat. 70. Even as initially enacted, however, the prohibition against federal injunctions was by no means absolute. See Norris-LaGuardia Act, §§ 7, 8, 9, 47 Stat. 71, 72. Shortly thereafter Congress passed the Wagner Act,[20] designed to curb various management activities that tended to discourage employee participation in collective action.

As labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from protection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes. This shift in emphasis was accomplished, however, without extensive revision of many of the older enactments, including the anti-injunction section of the Norris-LaGuardia Act. Thus it became the task of the courts to accommodate, to reconcile the older statutes with the more recent ones.

A leading example of this accommodation process is *Brotherhood of Railroad Trainmen* v. *Chicago River & Ind. R. Co.*, 353 U. S. 30 (1957). There we were confronted with a peaceful strike which violated the statutory duty to arbitrate imposed by the Railway Labor Act. The Court concluded that a strike in violation of a statutory arbitration duty was not the type of situa-

---

[20] National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*

tion to which the Norris-LaGuardia Act was responsive, that an important federal policy was involved in the peaceful settlement of disputes through the statutorily mandated arbitration procedure, that this important policy was imperiled if equitable remedies were not available to implement it, and hence that Norris-LaGuardia's policy of nonintervention by the federal courts should yield to the overriding interest in the successful implementation of the arbitration process.

The principles elaborated in *Chicago River* are equally applicable to the present case. To be sure, *Chicago River* involved arbitration procedures established by statute. However, we have frequently noted, in such cases as *Lincoln Mills,* the *Steelworkers Trilogy,* and *Lucas Flour,* the importance that Congress has attached generally to the voluntary settlement of labor disputes without resort to self-help and more particularly to arbitration as a means to this end. Indeed, it has been stated that *Lincoln Mills,* in its exposition of § 301 (a), "went a long way towards making arbitration the central institution in the administration of collective bargaining contracts." [21]

The *Sinclair* decision, however, seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices. Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking. On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under

---

[21] Wellington & Albert, *supra,* n. 18, at 1557.

a specifically enforceable agreement to submit disputes to arbitration.[22]  We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case.

## V

Our holding in the present case is a narrow one.  We do not undermine the vitality of the Norris-LaGuardia Act.  We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure.  Nor does it follow from what we have said that injunctive relief is appro-

[22] As well stated by the neutral members of the A. B. A. *Sinclair* committee:

"Any proposal which would subject unions to injunctive relief must take account of the Norris-LaGuardia Act and the opposition expressed in that Act to the issuing of injunctions in labor disputes. Nevertheless, the reasons behind the Norris-LaGuardia Act seem scarcely applicable to the situation . . . [in which a strike in violation of a collective-bargaining agreement is enjoined].  The Act was passed primarily because of widespread dissatisfaction with the tendency of judges to enjoin concerted activities in accordance with 'doctrines of tort law which made the lawfulness of a strike depend upon judicial views of social and economic policy.' [Citation omitted.]  Where an injunction is used against a strike in breach of contract, the union is not subjected in this fashion to judicially created limitations on its freedom of action but is simply compelled to comply with limitations to which it has previously agreed.  Moreover, where the underlying dispute is arbitrable, the union is not deprived of any practicable means of pressing its claim but is only required to submit the dispute to the impartial tribunal that it has agreed to establish for this purpose." A. B. A. *Sinclair* Report 242.

priate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in *Sinclair* suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief—principles that we now adopt:

> "A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 370 U. S., at 228. (Emphasis in original.)

In the present case there is no dispute that the grievance in question was subject to adjustment and arbitration under the collective-bargaining agreement and that the petitioner was ready to proceed with arbitration at the time an injunction against the strike was sought and obtained. The District Court also concluded that, by reason of respondent's violations of its no-strike obligation, petitioner "has suffered irreparable injury and will continue to suffer irreparable injury." Since we now

overrule *Sinclair,* the holding of the Court of Appeals in reliance on *Sinclair* must be reversed. Accordingly, we reverse the judgment of the Court of Appeals and remand the case with directions to enter a judgment affirming the order of the District Court.

*It is so ordered.*

Mr. Justice Marshall took no part in the decision of this case.

Mr. Justice Stewart, concurring.

When *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, was decided in 1962, I subscribed to the opinion of the Court. Before six years had passed I had reached the conclusion that the *Sinclair* holding should be reconsidered, and said so in *Avco Corp.* v. *Aero Lodge 735,* 390 U. S. 557, 562 (concurring opinion). Today I join the Court in concluding "that *Sinclair* was erroneously decided and that subsequent events have undermined its continuing validity . . . ."

In these circumstances the temptation is strong to embark upon a lengthy personal *apologia.* But since Mr. Justice Brennan has so clearly stated my present views in his opinion for the Court today, I simply join in that opinion and in the Court's judgment. An aphorism of Mr. Justice Frankfurter provides me refuge: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee* v. *Union Planters Bank,* 335 U. S. 595, 600 (dissenting opinion).

Mr. Justice Black, dissenting.

Congress in 1932 enacted the Norris-LaGuardia Act, § 4 of which, 29 U. S. C. § 104, with exceptions not here relevant, specifically prohibited federal courts in the broadest and most comprehensive language from

issuing any injunctions, temporary or permanent, against participation in a labor dispute. Subsequently, in 1947, Congress gave jurisdiction to the federal courts in "[s]uits for violation of contracts between an employer and a labor organization." Although this subsection, § 301 (a) of the Taft-Hartley Act, 29 U. S. C. § 185 (a), explicitly waives the diversity and amount-in-controversy requirements for federal jurisdiction, it says nothing at all about granting injunctions. Eight years ago this Court considered the relation of these two statutes: after full briefing and argument, relying on the language and history of the Acts, the Court decided that Congress did not wish this later statute to impair in any way Norris-LaGuardia's explicit prohibition against injunctions in labor disputes. *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195 (1962).

Although Congress has been urged to overrule our holding in *Sinclair*, it has steadfastly refused to do so. Nothing in the language or history of the two Acts has changed. Nothing at all has changed, in fact, except the membership of the Court and the personal views of one Justice. I remain of the opinion that *Sinclair* was correctly decided, and, moreover, that the prohibition of the Norris-LaGuardia Act is close to the heart of the entire federal system of labor regulation. In my view *Sinclair* should control the disposition of this case.

Even if the majority were correct, however, in saying that *Sinclair* misinterpreted the Taft-Hartley and Norris-LaGuardia Acts, I should be compelled to dissent. I believe that both the making and the changing of laws which affect the substantial rights of the people are primarily for Congress, not this Court. Most especially is this so when the laws involved are the focus of strongly held views of powerful but antagonistic political and economic interests. The Court's function in the application and interpretation of such laws must be carefully limited to avoid encroaching on the power of

Congress to determine policies and make laws to carry them out.

When the Court implies that the doctrine called *stare decisis* rests solely on "important policy considerations . . . in favor of continuity and predictability in the law," it does not tell the whole story. Such considerations are present and, in a field as delicate as labor relations, extremely important. Justice Brandeis said, dissenting in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406 (1932):

> "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right."

In the ordinary case, considerations of certainty and the equal treatment of similarly situated litigants will provide a strong incentive to adhere to precedent.

When this Court is interpreting a statute, however, an additional factor must be weighed in the balance. It is the deference that this Court owes to the primary responsibility of the legislature in the making of laws. Of course, when this Court first interprets a statute, then the statute becomes what this Court has said it is. See *Gulf, C. & S. F. R. Co.* v. *Moser,* 275 U. S. 133, 136 (1927). Such an initial interpretation is proper, and unavoidable, in any system in which courts have the task of applying general statutes in a multitude of situations. B. Cardozo, The Nature of the Judicial Process 112–115 (1921). The Court undertakes the task of interpretation, however, not because the Court has any special ability to fathom the intent of Congress, but rather because interpretation is unavoidable in the decision of the case before it. When the law has been settled by an earlier case then any subsequent "reinterpretation" of the statute is gratuitous and neither more nor less than

an amendment: it is no different in effect from a judicial alteration of language that Congress itself placed in the statute.

Altering the important provisions of a statute is a legislative function. And the Constitution states simply and unequivocally: "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." U. S. Const. Art. I. It is the Congress, not this Court, that responds to the pressures of political groups, pressures entirely proper in a free society. It is Congress, not this Court, that has the capacity to investigate the divergent considerations involved in the management of a complex national labor policy. And it is Congress, not this Court, that is elected by the people. This Court should, therefore, interject itself as little as possible into the law-making and law-changing process. Having given our view on the meaning of a statute, our task is concluded, absent extraordinary circumstances. When the Court changes its mind years later, simply because the judges have changed, in my judgment, it takes upon itself the function of the legislature.

The legislative effect of the Court's reversal is especially clear here. In *Sinclair* the Court invited Congress to act if it should be displeased with the judicial interpretation of the statute. We said, 370 U. S., at 214–215:

> "Strong arguments are made to us that it is highly desirable that the Norris-LaGuardia Act be changed in the public interest. If that is so, Congress itself might see fit to change that law and repeal the anti-injunction provisions of the Act insofar as suits for violation of collective agreements are concerned, as the House bill under consideration originally provided. It might, on the other hand, decide that if injunctions are necessary, the whole idea of enforcement of these agreements by private suits should

be discarded in favor of enforcement through the administrative machinery of the Labor Board, as Senator Taft provided in his Senate bill. Or it might decide that neither of these methods is entirely satisfactory and turn instead to a completely new approach. The question of what change, if any, should be made in the existing law is one of legislative policy properly within the exclusive domain of Congress—it is a question for lawmakers, not law interpreters."

Commentators on our holding found this invitation to legislative action clear, and judicial self-restraint proper. See Dunau, Three Problems in Labor Arbitration, 55 Va. L. Rev. 427, 464–465 (1969); Wellington & Albert, Statutory Interpretation and the Political Process: A Comment on Sinclair v. Atkinson, 72 Yale L. J. 1547, 1565–1566 (1963). Bills were introduced in Congress seeking to effect a legislative change. S. 2132, 89th Cong., 1st Sess. (1965); H. R. 9059, 89th Cong., 1st Sess. (1965). Congress, however, did not act, thus indicating at least a willingness to leave the law as *Sinclair* had construed it. It seems to me highly inappropriate for this Court now, eight years later, in effect to enact the amendment that Congress has refused to adopt. *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356 (1953); see also *United States* v. *International Boxing Club of New York, Inc.,* 348 U. S. 236, 242–244 (1955).

I do not believe that the principle of *stare decisis* forecloses all reconsiderations of earlier decisions. In the area of constitutional law, for example, where the only alternative to action by this Court is the laborious process of constitutional amendment and where the ultimate responsibility rests with this Court, I believe reconsideration is always proper. See *James* v. *United States,* 366 U. S. 213, 233–234 (1961) (separate opin-

ion of BLACK, J.).* Even on statutory questions the appearance of new facts or changes in circumstances might warrant re-examination of past decisions in exceptional cases under exceptional circumstances. In the present situation there are no such circumstances. Congress has taken no action inconsistent with our decision in *Sinclair*. *Girouard* v. *United States,* 328 U. S. 61, 70 (1946). And, although bills have been introduced, cf. *Helvering* v. *Hallock,* 309 U. S. 106, 119–120 (1940), Congress has declined the invitation to act.

The only "subsequent event" to which the Court can point is our decision in *Avco Corp.* v. *Aero Lodge 735,* 390 U. S. 557 (1968). The Court must recognize that the holding of *Avco* is in no way inconsistent with *Sinclair*. As we said in *Avco, supra,* at 561: "The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy." The Court contends, however, that the result of the two cases taken together is the "anomalous situation" that no-strike clauses become unenforceable in state courts, and this is inconsistent with "an important goal of our national labor policy."

---

*Other members of the Court have drawn the distinction between constitutional and statutory matters, and indicated that the correction of this Court's errors in statutory interpretation is best left to Congress. For example, MR. JUSTICE DOUGLAS noted in dissent in *Swift & Co.* v. *Wickham,* 382 U. S. 111, 133–134 (1965):

"An error in interpreting a federal statute may be easily remedied. If this Court has failed to perceive the intention of Congress, or has interpreted a statute in such a manner as to thwart the legislative purpose, Congress may change it. The lessons of experience are not learned by judges alone."

See also *United Gas Improvement Co.* v. *Continental Oil Co.,* 381 U. S. 392, 406 (1965) (DOUGLAS, J., dissenting). Apparently, however, some members of the Court are willing to give greater weight to *stare decisis* in constitutional than in statutory matters. See, *e. g., Orozco* v. *Texas,* 394 U. S. 324, 327–328 (1969) (HARLAN, J., concurring).

*Avco* does make any effort to enforce a no-strike clause in a state court removable to a federal court, but it does not follow that the no-strike clause is unenforceable. Damages may be awarded; the union may be forced to arbitrate. And the employer may engage in self-help. The Court would have it that these techniques are less effective than an injunction. That is doubtless true. But the harshness and effectiveness of injunctive relief—and opposition to "government by injunction"—were the precise reasons for the congressional prohibition in the Norris-LaGuardia Act. The effect of the *Avco* decision is, indeed, to highlight the limited remedial powers of federal courts. But if the Congress is unhappy with these powers as this Court defined them, then the Congress may act; this Court should not. The members of the majority have simply decided that they are more sensitive to the "realization of an important goal of our national labor policy" than the Congress or their predecessors on this Court.

The correct interpretation of the Taft-Hartley Act, and even the goals of "our national labor policy," are less important than the proper division of functions between the branches of our Federal Government. The Court would do well to remember the words of John Adams, written in the Declaration of Rights in the Constitution of the Commonwealth of Massachusetts:

> "The judicial [department] shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

I dissent.

MR. JUSTICE WHITE dissents for the reasons stated in the majority opinion in *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195 (1962).