**BARNES & TUCKER COMPANY,**
Plaintiff,

v.

**UNITED MINE WORKERS OF AMER-
ICA: District No. 2, United Mine
Workers of America, et al., Defendants.**

Civ. A. No. 71-1110.

United States District Court,
W. D. Pennsylvania.

Feb. 16, 1972.

William Alvah Stewart, III, Eckert,
Seamans, Cherin & Mellott, Pittsburgh,
Pa., for plaintiff.

Lloyd F. Engle, Jr., Wilner, Wilner &
Kuhn, Pittsburgh, Pa., for defendant.

OPINION

DUMBAULD, District Judge.

It is common knowledge that the
collective bargaining agreements govern-
ing the coal industry are negotiated on
the national level. In olden times the
negotiations were, on behalf of the min-
ers, in the hands of John L. Lewis, one
of the giant figures of the day, who
when he saw fit would defy the Presi-
dent and the federal courts.[1] Later ne-
gotiators, succeeding to the mantle of
the legendary patriarch, may have pic-
tured themselves in the situation of
Macbeth, of whom it was said:

> Now does he feel his title
>
> Hang loose about him, like a giant's
> robe
>
> Upon a dwarfish thief.[2]

The current contract, as the record in
this case discloses, was signed on No-
vember 12, 1971 (Tr. 20, 38), and the
Nixon pay board promptly gave its ap-
proval on the 19th (Tr. 21). The Dis-
trict Office immediately instructed the
men to return to work. Several mines
in the area had been idle, in accordance

---

1. Though holding the loyalty of his men on union-management issues, he could never keep them from supporting Franklin D. Roosevelt at election time, however. Regarding defiance of the courts, see United States v. United Mine Workers of America, 330 U.S. 258, 303-304, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

2. Shakespeare, *Macbeth*, Act V, sc. 3, lines 20-22.

with another well known United Mine Workers of America tenet—no contract, no work.

But the members of Local 1269 at plaintiff's mine did not return to work immediately after the contract was signed. At first, meeting on November 16th, they delayed until they received a copy of the contract (Tr. 26). On the 18th, and 21st, after receiving a copy of the contract (apparently disliking its terms) they voted again not to go back to work (Tr. 27). No grievances had been filed against the company between November 12th and the court hearing on the 24th, nor was any work done by the members of Local 1269 (Tr. 28–29, 31). A temporary restraining order was issued on November 24, 1971, and at a hearing on issuance of an injunction (held December 20, 1971) counsel submitted no additional evidence. The temporary restraining order was extended on December 8, 1971, for ten days. The questions of law remain to be determined.

■ The basic question is whether an injunction against work stoppage is proper under these circumstances, namely, where there is a binding collective bargaining agreement (not containing a no-strike provision) and where there is no grievance between the union members and the employer, but a disagreement between the union members and the upper echelons of the union hierarchy.

We begin consideration of the topic with the principle enunciated in the Norris-La Guardia Act,[3] that injunctions in labor disputes are in principle to be regarded with disfavor. This conclusion expresses the legislative condemnation of the previous history of excessive use of such injunctions, a history reviewed in the classical book by Frankfurter and Green.

The statutory language is couched in jurisdictional as well as substantive policy terms:

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter. [29 U.S.C. § 101]

"Ceasing or refusing to perform any work" is specified in 29 U.S.C. § 104 as one of the things which can not be enjoined.

The procedural provisions with which strict conformity is prescribed are found in 29 U.S.C. §§ 107 and 109; and definitions are contained in 29 U.S.C. § 113.

29 U.S.C. § 113(a) provides that:

A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

29 U.S.C. § 113(c) provides:

The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation

---

3. Act of March 23, 1932, 47 Stat. 70, 29 U.S.C. § 101 et seq.

of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

The disagreement between members of Local 1269 and the national union thus appears to fall within the definition in 29 U.S.C. § 113(a). The Norris-La Guardia Act therefore is applicable, unless later judicial exceptions to the prohibition against labor injunctions permit an injunction in the case at bar.

The present suit is brought under section 301 of the Taft-Hartley Act of June 23, 1947, 61 Stat. 156, 29 U.S.C. § 185 which enacts:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Basically this language merely confers jurisdiction on federal courts, without regard to jurisdictional amount or diversity of citizenship. But the right to sue would be empty if there were no cause of action created, and Congress seemed in this section to treat collective bargaining agreements as binding and actionable by a suit in federal court to enforce the provisions thereof. A federalized law of contracts was envisaged by the terms of this section.

In any event, the Supreme Court held in the leading case of Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 453–456, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957), that such was the Congressional intent, and that to that end the courts should "fashion" federal law to effectuate the policy of the labor laws enacted by Congress.

Later cases elaborated this doctrine, permitting injunctions to enforce no-strike agreements where the *quid pro quo* therefor was a binding agreement to arbitrate grievances.

Plaintiffs here rely on Boys Markets Inc. v. Retail Clerks Union, 398 U.S. 235, 247–250, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

The Court there held that injunctive relief was available in federal courts, notwithstanding the strictures of the Norris-La Guardia Act, first, because it would be anomalous to take away a remedy available in State courts by the simple device of removal to federal court (398 U.S. at 246, 90 S.Ct. 1583, 26 L.Ed.2d 199), but secondly, because deprivation of the effective equitable remedy by injunction would frustrate the policy of encouraging enforcement of arbitration agreements accompanied by no-strike provisions (398 U.S. at 247–248, 90 S.Ct. 1583, 26 L.Ed.2d 199). The Norris-La Guardia Act must therefore be adjusted and accommodated to the subsequently enacted provisions of Section 301 (398 U.S. at 250, 90 S.Ct. 1583, 26 L.Ed.2d 199).

No injunction is permitted, however, until the court determines that the controversy *does* arise out of a grievance which the parties are contractually bound to arbitrate, as well as that the traditional requisites of equitable relief exist (398 U.S. at 254, 90 S.Ct. 1583, 26 L.Ed.2d 199).

In Local 174, Teamsters etc. v. Lucas Flour Co., 369 U.S. 95, 104–106, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), it was held that the absence of a specific no-strike clause does not prevent application of the policy favoring enforcement of labor contracts. A binding agreement to arbitrate is to be interpreted as an implied agreement *pro tanto* not to strike. This implied obligation is coextensive with the agreement to arbitrate.

Applying these principles to the facts of the case at bar, we find that the absence of a specific no-strike agreement is not controlling. The crucial question

is, "Does the present dispute fall within the group of disputes covered by a binding agreement to arbitrate?"

The arbitration clause in the pertinent agreement is limited to grievances between the company and the union.

Article XVII of the 1971 contract deals with "Settlement of Disputes." Section (a) provides that employees shall elect a mine committee of three members. "The duties of the mine committee shall be confined to the adjustment of disputes arising out of this agreement that the mine management and the employee or employees have failed to adjust."

Section (b) prescribes grievance procedure:

> Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time.

The steps of the grievance procedure are specified. First the aggrieved party and his foreman shall have authority to "settle the complaint." Then the mine committee and the mine management are invoked. Then the United Mine Workers district representative and a designated representative of the employer are called into action. Then a new board (two members representing employees and two the employer) are designated to review the matter. If the board fails to agree, the matter shall be referred to an umpire.

It seems clear that all the terms of Article XVII are fashioned with a view to handling disputes between mine workers and mine management, not disputes between union locals and the higher echelons of the union hierarchy regarding the desirability *vel non* of the contract provisions accepted on behalf of the men during negotiation of the collective bargaining agreement.

Consequently the judicially elaborated exceptions to the anti-injunction provisions of the Norris-La Guardia Act enunciated in *Boys Markets* and similar cases are inapplicable to the case at bar, which remains governed by the anti-injunction policies of the earlier statute. Hence the injunction sought by plaintiff must be denied.

This ruling is without prejudice, of course, to subsequent litigation between plaintiff and defendants regarding any specific arbitrable grievances which may have arisen between them, or which may arise in the future.