**WOMELDORF, INC., Plaintiff,**

v.

**TEAMSTERS UNION LOCAL NO. 110 et al., Defendants.**

Civ. No. 73–917.

United States District Court, W. D. Pennsylvania.

Jan. 24, 1974.

Joseph J. Pass, Jr., Jubelirer, McKay, Pass & Intrieri, Anthony V. DeCello, Pittsburgh, Pa., for defendants.

James E. Coyne, Pittsburgh, Pa., Mark S. Dichter, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff.

## OPINION

DUMBAULD, District Judge.

On October 30, 1973, this Court routinely and *ex parte*, thinking we were dealing with what Judge Adams calls "a 'Boys Markets' injunction",[1] granted a temporary restraining order against a work stoppage upon presentation of a complaint containing copy of a collective bargaining agreement including a no-strike provision and a provision for grievance arbitration procedure in the usual form.

At the hearing on preliminary injunction on November 9, 1973, the union defendants contended persuasively that in fact no collective bargaining agreement was in force between plaintiff and defendants, and the Court was convinced that the temporary restraining order had been improvidently granted and should be permitted to expire.

The Court accepted, as on a common law demurrer, the truth of the allegations set forth by plaintiff's counsel, and concluded as a matter of law that "the determination sought to be judicially enforced is not the type of quasi-judicial award pursuant to a collective bargaining agreement which is so enforceable under current doctrine, but is a quasi-legislative negotiation of certain terms of such an agreement, the attempt to enforce which without exhausting the appropriate grievance procedure is premature, and this Court therefore has no authority to afford injunctive relief."

Stated differently, the Court was of opinion that the instant case did not fall within the *Boys Markets* exception[2] to the Norris-LaGuardia Act[3] which eliminated labor injunctions.

On November 9, 1973, an appeal was taken, and on the same day Judge van Dusen made an order whereby "the terms of the temporary restraining order entered by the United States District Court for the Western District of Pennsylvania, which expires tonight, are continued until further order of this court," and a hearing before a panel of the Court of Appeals was set for November 13, 1973, "to consider the continuance of such injunction pending appeal and the Motion for an expedited appeal."

At the hearing on November 13, 1973, before Judges Kalodner, van Dusen, and Adams, the following order was made:

It appearing on hearing that the parties are agreed that the cause should be remanded to the district court for a hearing on the application for a preliminary injunction, the stay

1. Avco Corp. v. Local Union # 787, 459 F. 2d 968, 969 (C.A. 3, 1972).

2. Boys Markets Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). See also Local 174 v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) and Barnes & Tucker Co. v. UMWA, 338 F.Supp. 924, 925–926 (W.D.Pa.1972).

3. Act of March 23, 1932, 47 Stat. 70, 29 U. S.C. § 101 et seq.

order of this court entered November 9, 1973 is hereby vacated, and the cause is remanded to the district court with directions to proceed forthwith to a hearing on the application for a preliminary injunction, without prejudice to an application to the district court for a temporary restraining order pending hearing. The mandate shall issue forthwith.

In pursuance thereof, a hearing was held by this Court on November 20, 21, and 26, 1973, where testimony was taken and oral argument heard. On account of the engagements of counsel and extensions granted, the briefing schedule was not completed as promptly as had been anticipated; and by that time the engagement of the Court in jury trials has similarly precluded prompter disposition of the case. Now, however, we have reviewed the evidence and read the briefs; and find that counsel are to be commended for the accuracy of their original presentations on November 8, 1973, for the facts as established by the evidence are substantially identical with those foreshadowed in counsel's presentations.

From the evidence, it appears that the trucking industry is governed by a complex three-tiered set of contractual arrangements. First is the National Master Freight Agreement (JX–2). This is supplemented by a local agreement known as the Joint Council No. 40 agreement, covering the Western Pennsylvania area which provides, *inter alia*, for the establishment of a body known as the Eastern Conference Joint Area Committee, which acts as an appellate agency in dealing with grievances, and is composed of representatives of both employers and employees.

Moreover, "riders" are negotiated between particular carriers and unions. The National agreement provides with respect to such agreements in Article II, section 5 as follows:

Riders or Supplements to this Agreement providing for better wages, hours and working conditions, which have been negotiated by Local Unions and Employers affected and put into effect, shall be continued, and shall be improved wherever required by the 1973 amendments to this Agreement except as to those better Riders which by agreement of the parties are subject to mutual agreement and adjustment on the supplemental area level. Such Riders, as improved, shall be submitted to the Conference Joint Area Committee for approval.

No new Riders or Supplements to this Agreement shall be negotiated unless approved by the Conference Joint Area Committee, if confined to the Conference Area, or by the National Grievance Committee if applicable to more than one Conference Area.

Riders to this Agreement and to Supplements thereto between Local Unions and Employers that do not meet the standards set forth in the National Master Agreement and Supplements thereto, shall be continued pending negotiations for amendment of such riders which negotiations shall be conducted and concluded within 90 days after July 1, 1973. In the event no agreement is concluded, the matter shall be referred during such period to the Conference Joint Area Committee, if confined to that Conference Area, or to the National Grievance Committee if applicable to more than one Conference Area, for final disposition. If the Conference Joint Area Committee or the National Grievance Committee as the case may be cannot finally dispose of the matter, such riders, and any other sub-standard Rider not submitted or approved, shall be null and void. However, wage and monetary matters negotiated in this Agreement shall become effective July 1, 1973.

Upon first impression, one might suppose that the riders were intended to embody better-than-average deals with respect to particular local conditions, and that the Master agreement was the least common denominator of the entire

industry. However, it appears clearly from the testimony of Thomas L. Fagan that riders are resorted to where the depressed economic conditions of a particular carrier warrants the union in accepting an arrangement which is *substandard* when measured by the national agreement. Indeed, the third paragraph of Article II, sec. 5 itself makes this clear.

Plaintiff Womeldorf in the past has enjoyed sub-standard status. Its tripartite arrangement expired June 30, 1973, but was extended to September 3, 1973, (DX–2), and again to September 20, 1973, (PX–6).

Womeldorf at all times retained its right to take independent action in negotiating collective bargaining agreements and did not authorize the Western Pennsylvania Motor Carriers Association or any other bargaining agent to negotiate on its behalf. Womeldorf was not a party to the master or Council No. 40 contracts except as such obligation may have flowed from an incident hereinafter discussed.

On September 26, 1973, Womeldorf and the union negotiator agreed on a rider, but it was rejected by the members of Local 110[4] (PX–7, pp. 3–4). Strike, work stoppage, or "economic action" against plaintiff began October 1, 1973.

On October 24, 1973, the Eastern Conference Joint Area Committee met at Myrtle Beach, South Carolina, before which representatives of plaintiff and Local 110 appeared and signed the document received in evidence as Plaintiff's Exhibit 6. The space where the Council No. 40 supplement should have been inserted was left blank. Womeldorf submitted its current offer (PX–5) and the union submitted both the September 26 agreement which had been rejected by the members and another proposal which it would consider acceptable. On October 25, 1973, the Committee approved a rider (PX–8) prepared by a panel (PX–

6). This is described as a compromise between the proposals submitted by the carrier and by the union.

Local 110 did not accept this decision as valid and binding but continued "economic action" until this Court's order of October 30, 1973. At the hearing before the Court of Appeals on November 13, counsel for the union is said to have said that the men were back at work only because of the Court's order. Plaintiff renewed its request for a restraining order, which was denied inasmuch as the Court was of opinion that it lacked jurisdiction under the Norris-LaGuardia Act. However, the Court requested counsel and their clients to arrange to "keep the lid on" until the Court could dispose of the case in due course. There has been no further incident, and the members of Local 110 are to be commended for their restraint out of respect to the Court and their contribution to the effective operation of judicial institutions for the due administration of justice.

The question for determination in the instant case is whether the action of the Joint Area Committee is a valid arbitral award under grievance procedures established by a collective bargaining agreement, and hence enforceable by the injunctive remedies afforded under the *Boys Markets* exception to the applicability of the Norris-LaGuardia Act.

Our conclusion, based upon the above-established facts as ascertained from the evidence received at trial, is that it is not.

It seems clear that Womeldorf is trying to get a "free ride" by using the machinery of the Joint Area Committee for a purpose which it was not intended to serve—much like a non-member of a union profiting by a wage increase negotiated by the union.

Not only was the submission untimely, but the Joint Area Committee is not an agency for the negotiation of collective bargaining agreements at all. Its func-

---

4. We are concerned only with Local No. 110. Issues discussed at Myrtle Beach with respect to other locals have been satisfactorily resolved.

tion is to settle disputes regarding interpretation and application of existing agreements.

We attach great weight to the testimony of Mr. Fagan, who said that he does not believe the Committee has such authority, but assumed or usurped it. Mr. Fagan is a figure of prominent stature in the labor movement, and a former member of the Pittsburgh City Council. The record here shows that he is president of Local 249, and as such obtained for the "city men" in his local a very favorable agreement with Womeldorf. He is also president of Joint Council No. 40.

It is quite clear that Womeldorf was never a party to the national or No. 40 contracts except as it may have accepted them *pro hac vice* at Myrtle Beach. The transcribed tape of proceedings there (PX-7) makes clear that Womeldorf accepted those agreements only as a means of getting a rider, and with a proviso that there be such a rider established. Mr. Womeldorf in answer to questions said "I don't believe we really do. . . . I'm saying yes we are with the condition that we have a Rider Agreement." He was then asked "But you do agree that you're a party to the National Master and the Joint Council #40 Supplemental Agreement with the understanding that you negotiate a Rider, is that correct?" and replied "That is correct." From the foregoing it seems clear that defendant was not bound *simpliciter* but only *sub modo*.

It is clear that this was simply an *ad hoc* arrangement and not the type of institutionalized arbitration established as part of a pre-existing collective bargaining agreement, which is contemplated by the *Boys Markets* exception to the Norris-LaGuardia Act.

5. The distinction is made clear by the analogy of international treaties for compulsory arbitration to lessen resort to war (the equivalent among nations of "economic action" or strikes by union members). The obligation to arbitrate is created by the treaty in advance of a particular dispute.

*Boys Markets* requires a pre-existing grievance procedure creating an *obligation to arbitrate* (for which a no-strike obligation, express or implied, is the *quid pro quo*). 398 U.S. at 248, 90 S.Ct. 1583, 26 L.Ed.2d 199. The *obligation to arbitrate* must be part of an established grievance procedure embodying compulsory arbitration. It is distinct from the *submission to arbitration* which takes place in execution or fulfilment of the obligation to arbitrate.[5] As stated by the Supreme Court, *Boys Markets* deals "only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." 398 U.S. at 253, 90 S.Ct. at 1594. A court applying the *Boys Markets* exception must be in position to order the employer "to arbitrate, as a condition of his obtaining an injunction against the strike." 398 U.S. at 254, 90 S.Ct. at 1594.

In the instant case Womeldorf was under no pre-existing obligation to arbitrate which antedated the submission (even if the submission were not conditioned upon obtaining a rider). When Womeldorf sought an injunction from this Court, plaintiff could not be ordered to arbitrate as a *quid pro quo* of the injunctive relief sought, for the submission to the Joint Area Committee had already occurred, and could not serve as *quid pro quo* for the injunctive relief. The case at bar does not fall within the *Boys Markets* exception to the Norris-LaGuardia Act; hence this Court is without jurisdiction to grant injunctive relief. The preliminary injunction sought by plaintiff is therefore denied. This opinion shall be deemed to embody the Court's findings of fact and conclusions of law.

The *submission* of a particular case is called a *compromis* or special agreement. Hyde, International Law (2nd ed. 1951) II, 1603–1604. What Womeldorf agreed to at Myrtle Beach was at best a *compromis*. *Boys Markets* contemplates a standing institutionalized grievance procedure.