505 F.2d 293
 87 L.R.R.M. (BNA) 2733, 75 Lab.Cas. P 10,394
 INLAND STEEL COMPANY, Plaintiff-Appellee,
v.
LOCAL UNION NO. 1545, UNITED MINE WORKERS OF AMERICA et al.,
Defendants-Appellants, Local Union No. 9111,
United Mine Workers of America, Appellant.
FREEMAN COAL MINING CORPORATION, Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA et al., Defendants-Appellants.
 Nos. 72-1893 and 72-1894.
 United States Court of Appeals, Seventh Circuit.
 Argued June 5, 1973.
Decided Oct. 22, 1974
Rehearing and Rehearing En Banc Denied Dec. 4, 1974.
 
 Duncan B. Cooper, III, Peoria, Ill., Lewis D. Sargentich, Daniel B. Edelman, Joseph A. Yablonski, Willard P. Owens, Washington, D.C., for appellants.
 Carter Harrison, Benton, Ill., Henry M. Thullen, John J. Cassidy, Jr., Paul F. Gleeson, Arthur B. Smith, Jr., Chicago, Ill., Paul S. Kuelthau, St. Louis, Mo., for appellees.
 Before KNOCH, Senior Circuit Judge, FAIRCHILD, Circuit Judge, and CAMPBELL, Senior District Judge.*
 WILLIAM J. CAMPBELL, Senior District Judge.
 These cases, Numbers 72-1893 and 72-1894, although separately briefed and argued, are consolidated for opinion since they involve similar facts and identical questions of law. The issue presented is whether the defendant unions' conduct in honoring a stranger union's picket line constituted an arbitrable issue under the collective bargaining agreement in force between the parties, and if so, whether that duty to arbitrate gave rise to an implied no-strike clause justifying the issuance of a Boys Markets[1] injunction. A related subsidiary question concerns the propriety of the injunctive order under traditional equitable considerations. Before reaching these issues, a threshold inquiry must be made into the union's right to challenge the underlying injunctive orders inasmuch as civil contempt citations were entered upon findings of the district court that the unions had willfully violated the injunction orders.
 I.
 The basic facts in both cases are largely undisputed and present a common factual scheme. Local 1545, United Mine Workers of America ('Local 1545'), represents underground employees of the plaintiff, Inland Steel Company ('Inland'), at its coal mine in Sesser, Illinois. Local 9111, United Mine Workers of America ('Local 9111'), represents underground employees of the Freeman Coal Mining Corporation ('Freeman') at its Orient #3 Mine in Waltonville, Illinois. At all pertinent times, both parties were bound by the National Bituminous Coal Wage Agreement of 1971.
 During this same period, Local 9111 also represented certain construction workers employed by Roberts & Shaefer Company who had been engaged in construction work at Freeman's Orient #3 Mine since February or March of 1972. The relationship between the construction workers and their employer was governed by a separate collective bargaining agreement known as the National Coal Mine Construction Agreement.
 In addition to Freeman's Orient #3 employees who were represented by Local 9111, other mining employees of Freeman at its various mines were represented by Locals 1591, 9878, and 1284 of the United Mine Workers of America. These employees were also covered by the National Bituminous Coal Wage Agreement of 1971.
 On August 14 and 15, 1972, construction employees of Roberts & Shaefer Company and members of Local 9111 appeared at Orient #3 and other Freeman mines and began picketing. Such pickets were also established at Inland's coal mine in Sesser, Illinois on August 15, 1972. The purpose of the picketing was stated to be the Pay Board's failure to approve the full measure of certain wage increases previously negotiated on behalf of the construction workers. As a result of the pickets, mining employees who were members of Locals 1545, 1591, 9111, 9878 and 1284 failed to report for work at Indand's mine and the various Freeman mines.
 The work stoppages continued for two days, after which both Inland and Freeman, in separate actions, petitioned the district court for injunctive relief under Section 301 of the Labor Management Relations Act (29 U.S.C. 185) and the rationale of Boys Markets.[2] The companies argue that the broad arbitration clause contained in the collective bargaining agreement governed this dispute and required that it be submitted to arbitration. The unions, on the other hand, maintain that Section 4 of the Norris-LaGuardia Act (29 U.S.C. 104) deprived the district court of jurisdiction over this controversy.[3]
 Almost simultaneously with the filing of the verified complaints, the district court entered ex parte temporary restraining orders calling for a halt to the work stoppages. Several days later, following full hearings at which all parties were represented by counsel, the district court entered temporary injunctions in both cases, specifically relying upon the holding in Boys Markets. The stoppages continued, however, and hearings on contempt citations were held in both cases. In the Freeman case, 72-1894, an order of civil contempt was entered against Locals 9111, 1591, 1284 and 9878 for their violations of the temporary restraining order and temporary injunction. Local 9111 was fined $10,000.00 per day for each day of violation and for each day that work stoppages continued. The other locals were fined $1,000.00 per day. These fines were subsequently reduced to $1,000.00 and $100.00 per day, respectively. All four locals have appealed, challenging the validity of both the injunctive and contempt orders.
 In the Inland case, 72-1893, a civil contempt order was entered against Local 1545 for its violations of the temporary restraining order and preliminary injunction. A fine of $10,000.00 per day for each day the violation of the court's injunctive order continued was imposed upon Local 1545. This fine was also later reduced to $1,000.00 per day. Local 1545 appeals from both the injunctive and contempt orders.
 II.
 Initially, both companies contend that we need not reach the question concerning the validity of the underlying injunctive orders because the civil contempt orders are otherwise enforceable. In this regard, they maintain that the district court had jurisdiction over the parties and the authority to determine its own jurisdiction under the Norris-LaGuardia Act, and that the injunctive orders were required to be complied with until reversed or set aside by orderly and proper review proceedings.[4] See, United States v. Mine Workers, 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Bethlehem Mines Corporation v. United Mine Workers of America, et al., 476 F.2d 860 (3rd Cir. 1973).
 In the Bethlehem Mines case, the Court of Appeals for the Third Circuit reached just such a result on the facts closely resembling those present in the cases before us. There is, however, one critically distinguishing factor in Bethlehem Mines. Insofar as it can be gleaned from that court's opinion, the contempt order there was coercive in nature; that is, it was designed to promote obedience to the court's orders. Where that is the case, the coercive civil contempt order is analogous to the criminal contempt order which clearly must be obeyed in order to permit the alleged contemnor to challenge the propriety of the underlying injunctive order. See, Brotherhood of Loc. Fire and Eng. v. Bangor and Aroostook R.Co.,127 U.S.App.D.C. 23, 380 F.2d 570, 583 (1967); United States v. Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).
 The contempt orders here, however, stand on a different footing. They were specifically found by the district court to be 'in the nature of compensation for losses and damages suffered by' the companies. Where the contempt is compensatory, 'the right to remedial relief falls with an injunction which events prove was erroneously issued, . . . and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court.' United States v. Mine Workers, 330 U.S. 258, 295, 67 S.Ct. 677, 697, 91 L.Ed. 884 (1947). Thus, if the contempt orders are to be sustained here, the validity of the underlying injunctions must be established.
 III.
 We proceed then to the merits of this controversy. The first question is whether the parties had a duty to arbitrate this dispute under the terms of the collective bargaining agreement then in effect between them. Although concededly difficult to articulate, the dispute may be characterized as whether the unions had the right under the agreement to refuse to cross picket lines established by another union.
 The pertinent parts of the collective bargaining agreement were recently described by the Supreme Court in the case of Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 374-378, 94 S.Ct. 629, 635-637, 38 L.Ed.2d 583, 590-592 (1974) which involved the National Bituminous Coal Wage Agreement of 1968. While discussing the arbitration provisions of the 1968 agreement, which are identical to those provisions in the 1971 agreement, the Court stated:
 'The section of the agreement entitled 'Settlement of Local and District Disputes' provides for resolution of grievances by direct negotiation between the parties and ultimately, should such negotiations fail, for arbitration by an impartial umpire 'mutually agreed upon by the operator or operators affected and . . . the United Mine Workers of America.' The section further states that the 'decision of the umpire shall be final.' This arbitration clause governs disputes 'as to the meaning and application of the provisions of this agreement,' disputes 'about matters not specifically mentioned in this agreement,' and 'any local trouble of any kind aris(ing) at the mine.' Paragraph 3 of the 'Miscellaneous' section of the agreement states that both parties 'agree and affirm . . . that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section . . .' It accepts from the arbitration obligation only those disputes 'national in character." Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 374-376, 94 S.Ct. 629, 635, 38 L.Ed.2d 583, 590-591 (1974).
 The 'Settlement Of Local And District Disputes'[5] and the 'Miscellaneous'[6] sections of the agreement are pivotal as to what constitutes an arbitrable issue thereunder. It is our conclusion that the 'any local trouble of any kind aris(ing) at the mine' language contained in this exceptionally broad arbitration clause is itself expansive enough to encompass the present disputes. A work stoppage which results from the honoring of stranger picket lines by company employees is certainly local trouble at the mine. Any other construction of this language would simply be ignoring the realities of the situation. Moreover, these parties agreed to arbitrate not only disputes concerning the meaning and application of the express provisions of the agreement but also disputes 'about matters not specifically mentioned in this agreement.' By the use of this terminology, we conclude that the parties mutually contracted to resolve any labor difficulties arising during the life of the agreement by the arbitration process, other than disputes which are 'national in character.'
 We further believe that this conclusion is enhanced by the strong public policy in favor of arbitration which was persuasively enunciated in the Steelworkers Trilogy.[7] The often discussed presumption of arbitrability for labor disputes was recently reaffirmed by the Supreme Court in Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 377-380, 94 S.Ct. 629, 636-638, 38 L.Ed.2d 583, 592-593 (1974). While the arbitrability of the disputes involved here may not be free from doubt, the Trilogy has instructed that all such doubts be resolved in favor of arbitration.
 In Gateway Coal, the Court also commented upon the value of arbitration, noting that it 'provides a method for resolving the unforeseen disagreements that inevitably arise.' Collective bargaining agreements cannot anticipate every conceivable labor difficulty, given the intricate relationship between the parties. The merits of an arbitration mechanism in this context were clearly envisioned by Congress when it enacted Section 203(d) of the Labor Management Relations Act (29 U.S.C. 173(d)).[8] The resolution of these disputes by a skilled labor arbitrator with his unique knowledge of the common law of the shop lends credence to this policy. The labor arbitration mechanism is better suited than the judicial process for making the kinds of interest accommodations that are necessary to the peaceful resolution of these disputes.
 Mindful of these policy considerations as announced in the Steelworkers Trilogy and recently underscored in Gateway Coal, we, therefore, hold that the dispute here fell within the arbitration clause of the collective bargaining agreement in existence between these parties.
 IV.
 We next consider whether the district court had jurisdiction to enjoin these work stoppages. As indicated in Gateway Coal, this question depends upon whether the union was under a contractual duty not to strike. Absent such a duty, the prohibitions of the Norris-LaGuardia Act deprive the district court of the authority to enter injunctive orders in these cases. However, as the Court held in Boys Markets Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), Section 301(a) of the Labor Management Relations Act empowers a federal court to prevent violations of a contractual duty not to strike under certain limited circumstances. The principal circumstance is that the work stoppage or strike must have been generated over an arbitrable dispute.
 We have previously found that circumstance to be present in these cases. Relying upon Amstar Corp. v. Amalgamated Meat Cutters & B. Workmen, 468 F.2d 1372 (5th Cir. 1972), the unions maintain that the dispute here was not 'over a grievance' which the parties were bound to arbitrate, but rather that the work stoppage itself precipitated the dispute. The companies, relying upon Monongahela Power Co. v. Local No. 2332 I.B.E.W., 484 F.2d 1209 (4th Cir. 1973), contend that the violation of a no-strike clause, express or implied, constitutes an arbitrable grievance justifying the issuance of a Boys Markets injunction. We conclude that neither Amstar nor Monongahela Power provide any guidance as to the issues before us. Both cases involved express no-strike clauses and both courts treated the issue as whether the violation of an express no strike clause itself creates an arbitrable issue for purposes of a Boys Markets injunction. Here, we have no express no-strike clause and have previously concluded that the work stoppage fell within the general language of the arbitration clause, since the issue of whether the unions may refuse to cross a stranger picket line is, under this agreement, arbitrable. We express no opinion on the issues as they were presented in Amstar and Monongahela Power.
 Nor is it of any consequence that the collective bargaining agreement here does not contain an express nostrike clause, as was present in Boys Markets. In Gateway Coal, this was not considered sufficient to defeat the district court's jurisdiction to enter an injunction under the rationale of Boys Markets. The reason is that 'a contractual commitment to submit disagreements to final and binding arbitration gives rise to an implied obligation not to strike over such disputes.' Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 381, 94 S.Ct. 629, 638, 38 L.Ed.2d 583, 594 (1974); Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); see also, Old Ben Coal Corp. v. Local U. No. 1487 of United Mine Workers, 457 F.2d 162, 164 (7th Cir. 1972). Thus, to the extent that a dispute is arbitrable, there exists an obligation not to strike over that dispute. Since we have concluded that the dispute here is subject to the arbitration process contained in the collective bargaining agreement between the parties, the unions here were bound not to strike. The district court thus had jurisdiction to enter the Boys Markets injunctions in these cases.
 V.
 There remains the question of whether the injunctive orders were proper under traditional equitable considerations. Our examination of the record convinces us that the companies made sufficient showings to entitle them to injunctive relief, including a clear demonstration of irreparable harm resulting from the work stoppages.
 Finally, the unions complain that the injunctions were improperly entered because they were not conditioned on the companies' willingness to arbitrate these disputes. The collective bargaining agreement here contains a mandatory arbitration clause. Where a dispute exists which is not otherwise resolved under the 'Settlement of Local and District Disputes' section of the agreement, the parties are contractually obliged to submit the matter to arbitration. At no time have the employers in the instant cases shown a reluctance or unwillingness to arbitrate the issues in dispute. On the contrary, by seeking Boys Markets injunctions, they demonstrated their desire to settle the dispute through arbitration. And, since the injunction may issue only if the dispute is subject to the agreement's mandatory arbitration provisions, the injunctive orders implicitly require the parties to arbitrate. Accordingly, the injunctions were not improperly entered and need not be modified. We view the orders, in their present form, as conditioned upon the parties' willingness to arbitrate the dispute, as they are obliged to do under this collective bargaining agreement.
 For the reasons stated, the judgments of the district court in 72-1893 and 72-1894 are affirmed.[9]
 Affirmed.
 FAIRCHILD, Circuit Judge (dissenting).
 I agree with the majority that the validity of the underlying injunctions is properly before this court. I respectfully disagree with the conclusion that they do not conflict with the Norris-LaGuardia Act.
 The Supreme Court, in Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), 'accommodated' the Norris-LaGuardia Act's proscription of labor dispute injunctions to the federal substantive policy favoring the private resolution of disputes through grievance and arbitration procedures developed under Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) and its progeny. This accommodation was narrowly circumscribed and limited to the granting of injunctions in situations where a work stoppage was 'over a grievance which both parties are contractually bound to arbitrate.' 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970). In my view, the refusal to cross a picket line involved in the present case is not 'over' an arbitrable grievance. Here, the dispute that precipitated the stoppage by appellants was the disagreement between the company and the construction workers which led to the formation of the picket line by the construction workers. This dispute is not arbitrable as between the parties to this proceeding, since the appellant unions are not directly involved.
 The majority states the arbitrable issue raised by appellants' honoring the stranger picket lines to be 'whether the unions had the right under the agreement to refuse to cross picket lines established by another union.' (Slip Opinion at p. 297). Concededly, such issue is raised by appellants' actions in this case, and arguably, would be arbitrable.[1] 1] The mere existence of such an issue, however, does not seem to me sufficient to trigger the limited 'accommodation' which Boys Markets made to the strict proscription of injunctive relief of Norris-LaGuardia.
 The purpose of Boys Markets was to foster the effectiveness of an arbitration agreement by precluding resort to the strike weapon in place of arbitration to which the parties had agreed. To enjoin in the present case is not to prevent substitution of a strike weapon for the arbitration procedure agreed upon, but to presume that recognition of a picket line has been forbidden by the contract unless and until an arbitrator rules that it has not. The matter has been analyzed as follows: 'If the arbitrable dispute is not a 'cause' of the work stoppage, then a concession on that dispute by the employer will not help to end the work stoppage. Under these circumstances, the work stoppage will exert no pressure on the employer to resolve the arbitrable issue short of arbitration. Thus, if this basic cause-effect relationship between the arbitrable issue and the strike is not present, the strike will not discourage arbitration and the policy that favors the arbitration of labor disputes will not be furthered by the issuance of an injunction.' N.A.P.A. Pittsburgh, Inc. v. Chauffeurs, Local 926, 502 F.2d 321, 330 (3rd Cir. 1974), Hunter, J., dissenting. To hold otherwise would be to permit the narrow exception created by Boys Markets to subsume the rule.[2]
 
 
 
 *
 Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation
 
 
 [1]
 Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, (1970)
 
 
 [2]
 29 U.S.C. 185(a) provides: 'Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or . . . the citizenship of the parties.'
 
 
 [3]
 29 U.S.C. 104 provides:
 'No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment . . ..'
 
 
 [4]
 See, Cox, 'The Void Order And The Duty To Obey', 16 U. of Chi.L.Rev. 87-115 (1948), for an analytical discussion of these 'jurisdictional' concepts
 
 
 [5]
 This section provides, in relevant part:
 'Should differences arise between the Mine Workers and the operators as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at been upheld, and since we find the contempt settle such differences immediately: (The parties will not be represented by legal counsel at any of the steps below.)
 '1. Between the aggrieved party and the mine management. '2. Through the management of the mine and the mine committee. '3. Through district representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company. '4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the operators. Neither the Mine Workers' representatives on the board nor the operators' representatives on the board shall be the same persons who participated in steps (1), (2), or (3) of this procedure. '5. Should the board fail to agree the matter shall, within twenty (20) days after decision by the board, be referred to an umpire to be mutually agreed upon by the operator or operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the operator or operators affected and by the Mine Workers. 'A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement.'
 
 
 [6]
 This section provides:
 'The United Mine Workers of America and the operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of this agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts.'
 
 
 [7]
 United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprises Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [8]
 This section provides:
 'Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.'
 
 
 [9]
 Since the underlying injunctive orders have been upheld, and since we find the contempt orders were otherwise proper, they are also affirmed
 
 
 [1]
 The 'Settlement of Local and District Disputes' section of the collective bargaining agreement provides for arbitrations of 'differences . . . as to the meaning and application of the provisions of this agreement . . ..'
 
 
 [2]
 See Amstar Corp. v. Amalgamated Meat Cutters & B. Workmen, 468 F.2d 1372, 1373 (5th Cir. 1972); General Cable Corp. v. IBEW, Local 1644, 331 F.Supp. 478, 482 (D.Md.1971); Simplex Wire and Cable Co. v. Local 2208, IBEW, 314 F.Supp. 885, 886 (D.N.H.1970); N.A.P.A. Pittsburgh, Inc. v. Automotive Chauffeurs, Parts and Garage Employees, Local Union 926, 502 F.2d 321, 329-333 (3rd Cir. 1974), Hunter, J., dissenting; Gary-Hobart Water Corp., 210 N.L.R.B. No. 87, 86 LRRM 1210, 1214 (N.L.R.B., 1974). But, cf. Monongahela Power Co. v. Local No. 2332, I.B.E.W., 484 F.2d 1209 (4th Cir. 1973); Pilot Freight Carriers v. Teamsters, 497 F.2d 311 (4th Cir. 1974); Bethlehem Mines Corp. v. U.M.W.A., 375 F.Supp. 980 (W.D.Pa.1974)