GREATER NEW YORK HEALTH CARE FACILITIES ASSOCIATION, INC., a New York Not–For–Profit Corporation, Individually and on behalf of its member residential health care facilities, Plaintiff,

v.

Peter OTTLEY, Individually and as President of Local 144, Hotel, Hospital, Nursing Home and Allied Service Employees Union, SEIU, AFL–CIO, Defendants.

No. 80 Civ. 0258 (KTD).

United States District Court,
S. D. New York.

Sept. 12, 1980.

Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for plaintiff; Jerald R. Cureton, Barry F. Bevacqua, Philadelphia, Pa., of counsel.

Vladeck, Elias, Vladeck & Engelhard, P. C., New York City, for defendants; Robert A. Cantore, New York City, of counsel.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

On January 21, 1980, I issued a preliminary injunction to forestall a strike or a threat to strike by the defendant Local 144, representative of nursing home employees, at the nursing homes owned and operated by members of the plaintiff, Greater New York Health Care Facilities Association, Inc. [hereinafter referred to as "Association"]. Seven months later, the defendant presented to me an order to show cause to vacate the injunction. The order to show cause also requested an injunction against the plaintiff from locking out members of Local 144 and hiring "scabs" at the Surfside Nursing Home, an Association member.

On September 2, 1980, in light of the allegations and some other matters which had come to my attention in the interim, I signed the order to show cause and granted a suspension of the preliminary injunction in order to permit the union to give a ten–day strike notice. On September 5, 1980, a hearing was held before me on these issues. As a result of these hearings, I have determined that the reasons for granting the preliminary injunction last January no longer exist.

The collective bargaining agreement between the parties contains a no–strike clause and a mandatory arbitration provision. The United States Supreme Court in *Boys Markets v. Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1969) set out the legal reasons for issuance of an injunction to enforce such provisions. My reasons for granting the injunction last January, however, were not based on legal criteria alone. The injunction was premised on principles of equity which, in the end, were found to balance in favor of the plaintiff. At the time, I felt both parties fell short of living up to the spirit of arbitration. The specific maneuverings of each party are adequately described in my prior opinion and need not be repeated here. Suffice it to say, two overriding factors existed to influence my initial decision. First, the Association was apparently showing a new willingness to abide by the arbitration process. Specifically, the Association had delivered a check to Blue Cross for the continuation of hospital benefits; the parties agreed that I could appoint a new arbitrator; and the Association's motions to stay arbitration were disposed of. The second and perhaps most significant factor was the undesirable effect a strike would have on the patients being cared for in the nursing homes. The care they receive is supplied largely by members of the Union. It was a concern for these innocent people that in my mind shifted the equities in favor of an injunction.

While I remain concerned for the welfare of these patients, facts revealed at the September 5th hearing demonstrate that the Association's questionable conduct is seriously undermining my initial perception of their position.

There was proof presented at the hearing which tends to show a lock–out of Union employees at one of the Association member's facilities, the Surfside Nursing Home. The Association claimed that Surfside could not pay its employees because the Union had placed a lien on the Medicaid reimbursement account which the State maintained for the nursing home. The Union agreed that it had done so to enforce a prior arbitration award. Moreover, the Association claimed that the employees at Surfside had been offered the option of continuing work without pay. Apparently, Mr. Lawson, executive director of the Association, was called in to assist the situation on August 12. Lawson had been working with Mrs. Frankel, the managing partner of the nursing home, in connection with its overall financing. When he was called on that Tuesday, Lawson spoke with both Mrs. Frankel and with Mr. Moskovitz, the Administrator of the home.

Lawson then dealt with Ottley, president of the Union, and with Mr. Cantore, the attorney representing the Union, and was successful in obtaining a release of medicare funds sufficient to pay the employees for one week. For some reason, he told Mr. Moskovitz that there would be funds for two weeks and Moskovitz in turn told the employees that they would be paid. On Wednesday, August 20th, Moskovitz discovered that there would not be funds available to meet the payroll for that week and he told the employees that this was the fault of the Union.

It is unclear whether Lawson had informed Mrs. Frankel about the truth of the situation. Although the Union attempted to get Mrs. Frankel to testify, I did not require that she be produced because it was represented that she had no knowledge of the circumstances. It became clear at the hearing that that representation was untrue.

In any event, it appears that Mr. Moskovitz originally told the employees the misin-

formation he received from Lawson. On discovering the truth, he told the employees that they would not be paid and they became very upset. On Thursday and Friday, August 21 and 22, 1980, the shop steward attempted to negotiate with Moskovitz for payment. Lawson was at the nursing home all day Thursday at least. He proposed that the employees continue working without pay and eventually they would be paid for the current week plus 25 percent of the back wages until all the monies due were paid. On Friday, August 22, the shop steward relayed this proposal to the employees who became upset and rejected it. The employees then gathered in the day–T.V. room in the facility in an attempt to negotiate a better arrangement. A licensed practical nurse and an aide were left on each floor during these activities.

This gave Lawson and the Association the opportunity they had sought to create. Replacement employees had already been contacted by the Association and some had been told to report to Surfside. Armed guards had been hired by the Association to work at Surfside. Extra provisions had been stocked at the facility. Arrangements had even been made for a chain link fence to surround the facility.

On Friday, the day shift employees remained in the meeting attempting to get some resolution of the problem and some payment of the wages which were then overdue. Mrs. Frankel was not on the premises all day Friday or Saturday. Mr. Moskovitz left early Friday evening between 6 to 6:30 p. m. to observe Shabbis. This left Mr. Lawson as the sole negotiator for Surfside.

At about 8 o'clock, Lawson told the employees that he was powerless to do anything since both Mrs. Frankel and Moskovitz were observing the Sabbath. Although he denied it at the hearing, I am convinced that he told the employees to return to work the following day.

On Saturday, when the employees returned to work, they were given termination notices and discovered that they had already been replaced. It is important to note that since both Mrs. Frankel and Mr. Moskovitz were strict Sabbath observers this action could only have been taken by the Association and Mr. Lawson.

The entire incident arose simply because Lawson did not tell Mr. Moskovitz the truth. I do not know whether Lawson lied to Moskovitz or whether he just permitted him to be deceived. One way or the other, it appears that Lawson engineered the situation. I cannot permit such deceptive practices to have the continued protection of this Court's equitable powers. Mr. Lawson and the Association permitted the circumstances at Surfside to become critical, thus providing the ostensible justification for the termination of the Union member–employees and hiring of replacements. None of these actions would have occurred if Mr. Lawson did not have the strike injunction to fall back on.

Furthermore, it remains uncontroverted that the Welfare Fund continues to be in debt to Blue Cross, a problem which had at least been temporarily ameliorated as of last January. Plaintiff asserts that the funds have always been in arrears and therefore this indebtedness should not be grounds for vacating the injunction (Plaintiff's Memorandum p. 6). This argument overlooks the fact that plaintiff is obliged to avoid such delinquencies. When I issued the injunction in January, there were signs that the Association was making efforts to fulfill these obligations. Evidently, such efforts have been abandoned.

As a result of these developments, I do not find that the equities of the present situation weigh in favor of further protection of the Association from employee strikes. Therefore, I hereby vacate my January 21, 1980 order that issued a preliminary injunction against the Union from striking or threatening to strike.

■ Defendants' request from a preliminary injunction against Surfside Nursing Home to *inter alia* reinstate members of the Union and to prevent further lock–outs must be deferred to the primary jurisdiction of the National Labor Relations Board.

This request involves unfair labor practice issues that are best resolved by the Board. *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

Finally, I hereby order that copies of this opinion be sent to each member of the plaintiff Association.

SO ORDERED.